599 F.2d 453
 7 O.S.H. Cas.(BNA) 1373, 1979 O.S.H.D. (CCH) P 23,573
GENERAL DYNAMICS CORPORATION, QUINCY SHIPBUILDING DIVISION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION et al., Respondents.
 No. 78-1348.
 United States Court of Appeals,
First Circuit.
 Argued March 12, 1979.
Decided May 23, 1979.
 
 Paul V. Lyons, Boston, Mass., with whom Lewis H. Weinstein, Stephen B. Deutsch, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for petitioner.
 Thomas L. Holzman, Atty., Dept. of Labor, with whom Carin A. Clauss, Sol. of Labor, Washington, D. C., Albert H. Ross, Regional Sol., Boston, Mass., Benjamin W. Mintz, Associate Sol., Washington, D. C., for Occupational Safety and Health, and Allen H. Feldman, Acting Counsel for Appellate Litigation, Washington D. C., were on brief, for respondents.
 
 
 1
 Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*
 
 
 2
 PETTINE, District Judge.
 
 
 3
 The employer, a shipbuilder, (Quincy), petitions this court to review a decision of the Occupational Safety and Health Review Commission (the "Review Commission") that the employer committed a serious violation of the general duty clause, section 5(a)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(1),[1] by failing to provide adequate safety instructions on the procedure for supporting vertically-standing steel plates. The Review Commission levied an $800 penalty. We have jurisdiction to review the Review Commission's order under 29 U.S.C. § 660.
 
 
 4
 This case arises from an investigation by the Occupational Safety and Health Administration (OSHA) following the death of one of Quincy's employees on Dec. 20, 1974. The employee, Robert LeVangie, died when a 3500 pound web frame fell on him. It is undisputed that this frame fell because certain braces, known as monuments, were removed before the frame was securely fastened. In installing a web frame, a shipfitter tack welds the bottom to the bulkhead (a large steel plate) on at least one side, then tack welds part of the web frame known as stiffeners to steel beams called longitudinals which run along the bulkhead perpendicular to the web frame. While doing this the shipfitter also adjusts the web frame to make sure it is plumb and properly aligned. In performing this operation the longitudinals often must be shifted. Once the aligning and tack welding is completed, the shipfitter's job is complete. Subsequently, a final weld is performed by a welder.
 
 
 5
 It is undisputed that the monuments supporting the web frame should not be removed until the web frame has been tack welded to the bulkhead on at least one side,[2] and also tack welded to the longitudinals. The ALJ found that one Edwin Sullivan, then a second class shipfitter with eight years' experience, who was working in a nearby area, removed three monuments from web frame No. 76 on unit 495-2 before it was proper to do so. This occurred without the knowledge of Robert Coutts, a beginner shipfitter with eight weeks' experience who was installing web frame No. 76. Although the web frame had been tack welded to the bulkhead on one side, the stiffeners had not been tack welded to the longitudinals. Coutts then moved the fourth monument in order to make an adjustment in the position of one of the longitudinals. While he was attempting to do this, the unsupported web frame fell over, killing LeVangie, who had been working on the adjacent web frame, No. 76 1/2.
 
 
 6
 As a result of the accident, OSHA conducted an investigation, and issued a citation which charged Quincy with a serious violation of section 5(a)(1) of the Act in that
 
 
 7
 (e)mployer failed to furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.
 
 
 8
 On December 20, 1974, monuments supporting a web frame on a bulkhead in No. 1 Fabrication Shop, A Platform, were removed before all tack welding on this web frame had been completed, contrary to standard procedure, resulting in a fatal accident.
 
 
 9
 After Quincy filed a notice of contest a complaint issued, stating the same basis for a violation.[3] Quincy defended on the grounds that the incident involved was an "isolated occurrence" arising from the idiosyncratic behavior of its employees. The case was tried before an Administrative Law Judge (ALJ) on July 9 and 10, September 10 and 11, and October 29, 1975. The ALJ, stating the issue to be "whether the respondent failed in its duty under section 5(a) (1) of the Act to furnish a place to work free of recognized hazards because of insufficient supervision and training of its employees", concluded that the Secretary failed to prove there was inadequate supervision and training of either Coutts or Sullivan and vacated the citation.
 
 
 10
 The Review Commission rephrased the issue to be whether Quincy failed "to provide adequate safety instructions on the procedure for supporting vertically standing steel plates" to its employees in general, and reversed the ALJ. The Review Commission felt the ALJ had improperly focused on the foreseeability of the accident as it actually occurred, rather than whether Quincy "adequately instructed all its employees who worked with web frames in the practices necessary to prevent the occurrence of inadequately supported web frames. Unless Quincy did so, it cannot be said that the company rendered its workplace free of the recognized hazards such web frames present". Slip op. at 10.
 
 
 11
 In this appeal, Quincy alleges (1) that the Review Commission improperly affirmed the citation on grounds that were not referred to in the citation and which the parties and the ALJ specifically agreed during the hearing were irrelevant; (2) that the Review Commission improperly ignored certain of the ALJ's credibility findings; and (3) that the conclusion that inadequate employee training caused the hazard is not based on substantial evidence. Although these arguments are not without merit, we conclude that the Review Commission acted properly and affirm.
 
 
 12
 (1) The alleged change in the grounds for the citation.
 
 
 13
 Quincy argues that the Review Commission improperly decided the case on the basis of the company's overall training program, rather than the Dec. 20, 1974 removal of monuments supporting web frame 76. It argues that the citation and complaint placed it on notice that its alleged violation was a premature removal of the monuments at a specific time, in a specific location, resulting in the occurrence of a specific "recognized hazard". While safety and training programs were also relevant because an employer can receive up to a 20% Reduction in penalty for an effective safety training program, Quincy alleges it had no reason to present an "all out" defense of its safety and training program because it had no reason to think the affirming or vacating of the citation itself would turn on the value of these programs. Quincy maintains that this was also the position of the Secretary and the ALJ. Consequently, it claims the Review Commission's decision violated due process by changing the charge in mid-case, to the substantial prejudice of Quincy's ability to defend itself.
 
 
 14
 The basic legal question is whether inadequate training and supervision can form the basis for affirming a citation which is based on the occurrence of a recognized hazard and which does not mention training and supervision, when the employer defends on the basis of idiosyncratic employee behavior. If the answer to this question is yes, then the only other issue is whether Quincy was prejudicially misled into thinking that inadequate training and supervision could not form the basis for affirming the citation. For the reasons which follow, we conclude that the Review Commission acted properly and that Quincy was not prejudicially misled.
 
 
 15
 The duty imposed by section 5(a)(1) to furnish employees with a workplace free from recognized hazards likely to cause death or serious physical injury requires an employer to take steps to prevent and suppress hazardous conduct by employees, including proper training and supervision of employees. An employer is not an insurer, and need not take steps to prevent hazards which are not generally foreseeable, including idiosyncratic behavior of an employee, but at the same time an employer must do all it feasibly can to prevent foreseeable hazards, including dangerous conduct by its employees. National Realty and Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 141-42, 489 F.2d 1257, 1265-66 (1974); Brennan v. Butler Lime & Cement Co., 520 F.2d 1011, 1017 (7th Cir. 1975). Consequently, an employer can defend a charge that it violated the Act on the basis that it took all necessary precautions to prevent the occurrence of the violation. Horne Plumbing & Heating Co. v. OSHRC, 528 F.2d 564, 571 (5th Cir. 1976).
 
 
 16
 The present case follows this approach. Faced with a charge that it allowed the monuments supporting the web frame to be removed prematurely, Quincyresponded that the hazard which resulted (an unsupported web frame) occurred primarily due to the unauthorized, idiosyncratic behavior of Sullivan (and to a lesser extent, similar behavior of Coutts). Therefore, it would normally be incumbent on Quincy to demonstrate it had taken all feasible steps to reduce the incidence of such violations by its employees. I.T.O. Corp. of New England v. OSHRC, 540 F.2d 543, 545 (1st Cir. 1976). Such steps obviously include training employees as to the danger of unsupported web frames, of the need to insure that monuments are in place, and the appropriate time at which monuments can be removed. The amount of supervision given an employee is also highly relevant, although unquestionably an employee need not be supervised every second, especially as the employee becomes more experienced and aware of proper safety procedures. Therefore, when the employer's defense is that the hazard occurred as a result of unauthorized and idiosyncratic behavior by its employees, the issue of an employer's training and supervision of its employees automatically arises as part of the employer's showing that it took all feasible steps to avoid the occurrence of the hazard.
 
 
 17
 Although the ALJ stated the issue correctly, he committed error in focusing on the accident as it occurred rather than whether the employer had taken the proper precautionary steps, including adequate safety training, to prevent the occurrence of a hazardous condition. See Brennan v. Butler Lime & Cement Co., 520 F.2d at 1017; National Realty and Construction Co. v. OSHRC, supra. Even though an accident may occur because of unforeseeable events, a violation of the general duty clause may exist if the employer failed to take precautionary steps to protect its employees from the occurrence of the general hazard here, the hazard of an unsupported web frame. Brennan v. OSHRC (Vy Lactos), 494 F.2d 460, 463 (8th Cir. 1974). Consequently, the question is not whether Coutts or Sullivan themselves knew they should not remove monuments before the tack welding is completed. Instead, the question is whether Quincy had taken steps to insure that all its employees, including Coutts and Sullivan, knew that they should not remove monuments prematurely. Without finding it so in this case, the fact remains that an employee may know the dangers of a bad practice and persist in such conduct with the tacit approval or indifference of the company.
 
 
 18
 Applying these principles, the Review Commission rejected the ALJ's decision that the citation should be vacated because the acts of Coutts and Sullivan were unforeseeable. Instead, it properly focused on the question of " whether Quincy adequately instructed all its employees who worked with web frames in the practices necessary to prevent the occurrence of inadequately supported web frames". Slip op. at 10. We can find no error in the Review Commission's decision to correct the ALJ's misinterpretation of the law. Furthermore, because it was only correcting a legal error, this action by the Review Commission cannot be said to have changed the grounds for the citation.[4]
 
 
 19
 However, despite the basic principle that training is relevant whenever an employer defends on the basis of idiosyncratic employee behavior, Quincy argues that the course of the hearing prejudicially misled it into thinking that training was not relevant to the substantive question of whether Quincy had violated the Act. The basic principle did become somewhat muddled during the hearing, perhaps in part because the ALJ himself did not recognize the complete extent to which training was relevant.
 
 
 20
 Most of the testimony at the hearing was directed toward showing not only that an unsupported web frame was unsafe, but also that Quincy's employees were not properly trained or supervised as to when it was proper to remove the monuments. Nonetheless, both the parties and the ALJ stated on several occasions, notably on the third day, that the issue of training and safety programs went only to the size of the penalty, not to whether a violation of the Act occurred.
 
 
 21
 For example, when John Fiatarone, the Area Director of OSHA, testified on the third day, he explicitly stated the "recognized hazard" to be "the free standing plate, the fact that the monuments had been removed without sufficient welds". He also stated that he had not considered the employer's training program in issuing the citation, and that the issue of training was only in regard to the size of the penalty. Yet at the same time, he testified that if there had been adequate safety training, an employee would not have removed the monuments. He also said that the employer should have alerted the employees, through proper training, to the recognized hazard that would result if they did not keep the monuments in place until the web plate was properly welded, and that a combination of such training and explicit instructions from a supervisor not to remove the monuments prematurely could avoid the creation of the hazard. Consequently, while he stated that the training program went only to the penalty, it is also clear that Fiatarone felt creation of the hazard could have been avoided had the employer taken proper steps in training.
 
 
 22
 Similarly, on the third day, counsel for the Secretary stated several times that the issue of training went only to the penalty. Yet, during a discussion at the close of the Secretary's case, prior to the ALJ's ruling on Quincy's motion to dismiss, he backed off this position slightly, stating that training was "involved" with the main issue of whether the failure to have monuments constituted a violation, but that Quincy was "not charged with that as the major violation". These latter statements are equivocal; they seem to state that safety training is relevant not only to the amount of penalty, but also to how it happened that the hazard of an unsupported web frame occurred. Yet, they also maintain that inadequate safety training Per se is not the basis for the citation.
 
 
 23
 Relying primarily on the last statements by counsel for the Secretary, the ALJ denied the motion to dismiss. He went on to say, however, that
 
 
 24
 If we are trying the issue whether or not the proper training or supervision was the violation, that was not alleged. If (sic) was the failure to provide monuments.
 
 
 25
 Quincy argues that in spite of the ambiguous statements of Fiatarone and counsel for the Secretary, this holding by the ALJ implies that if inadequate training and supervision had been a major element in the case, the motion to dismiss would have been granted on the grounds that the Secretary was trying to litigate an issue not raised in the citation. We find, however, that this is too broad a reading of the ALJ's ruling. The ALJ only ruled that so long as inadequate training and supervision was not the basis for the charge of a major violation, the case could continue. He did not hold that inadequate training and supervision could not be used to rebut Quincy's claim that the "recognized hazard" which it was charged with allowing to occur was the result of idiosyncratic employee behavior.[5] To this extent training could still be a major element in the case.
 
 
 26
 This interpretation of the ALJ's ruling is buttressed by the course the rest of the hearing took. Quincy opened its case by presenting OSHA Compliance Officer Wesley P. Holbrook, who conducted the investigation which resulted in the citation. Mr. Holbrook, under questioning by Quincy's own counsel, presented considerable testimony that the training program was inadequate. We find it difficult to believe that training was not a significant issue when Quincy itself introduced so much testimony regarding its programs. Indeed, the next day (day 4), during Quincy's direct examination of the next witness, Philip Pitts, a shipfitting supervisor for Quincy, the ALJ specifically noted that training may have become an issue.
 
 
 27
 Of even greater significance is the following exchange between counsel for the Secretary and the ALJ, which occurred on day 4 during cross-examination of Paul Sousa, Quincy's Chief of Safety:
 
 
 28
 MR. SOLOMON: Your Honor, if I may, the issue raised by the Respondent is that the occurrence is in an isolated instance contrary to particular reports on safety practices. I think that by this line of questioning I can show there has been no consistent enforcement of safety practices, and if there hadn't been a death here there would not be any action whatsoever taken against Mr. Sullivan.
 
 
 29
 THE COURT: It seems to me that the issue that has been brought out here is whether or not this Company adequately provided a safe workplace for these employees and that included the training and supervision of new ones, the customary training and adequate supervision, in this particular case, which has been given so much significance as to Mr. Grant and Mr. Sullivan.
 
 
 30
 This whole case is dependent upon whether or not this fatality occurred because of some short comings of the employee by the General Duty Clause Act which provides a safe place to work, free of recognized hazards. That's the issue.
 
 
 31
 MR. SOLOMON: That's the issue, your Honor. But there is another issue raised by the Respondent in its defense in that the Respondent is not liable, even if there was a recognized hazard, because the recognized hazard occurred as a result of an isolated issue. That is a legal defense that has certain elements to it. I am entitled to explore it.
 
 
 32
 I think that one of the elements that Respondent has to show is consistently enforced safety practices.
 
 
 33
 This exchange, followed by the ALJ allowing counsel for the Secretary to examine the witnesses as to consistently enforced safety practices, indicates that the ALJ was aware that safety practices are relevant to the question of whether the employer has provided a safe workplace. Counsel for the Secretary clearly stated why he felt evidence as to safety practices was necessary to show that the occurrence of the hazard was not due simply to idiosyncratic behavior by one or two employees, but rather due to inadequate training and supervision by the employer.
 
 
 34
 Hence, by the end of the fourth day of the hearing, it should have been evident that Quincy's training and supervision of employees in safety practices was relevant to Quincy's defense, and that Quincy should show the adequacy of its program in order to prove that it could not have prevented the occurrence of the hazard. The fifth day of hearings was almost seven weeks later. In that interim Quincy had ample time to gather more witnesses to support its claims.
 
 
 35
 The fifth and last day of hearings revealed, however, that Quincy still had not recognized the relevancy of its training and supervision programs. Counsel for Quincy protested that supervision and training were completely irrelevant to the general duty clause, could not be part of a violation, and had nothing to do with the facts upon which the citation issued, notwithstanding the prior discussions in which the ALJ conceded the relevancy of such information. The ALJ responded by noting that under the general duty clause a broad scope of issues are relevant, and allowed counsel for the Secretary to continue to explore the issue.
 
 
 36
 Later that day, during the Secretary's rebuttal case, counsel for Quincy again objected to the introduction of testimony as to the training given employees. Counsel for the Secretary responded with a clear statement as to why such evidence was relevant:MR. SOLOMON: Your Honor, the issue of training, supervision, and instruction relates, certainly, to the affirmative defense of the Respondent, I believe, your Honor, the law is clear that under that defense Respondent must show that there was a consistently enforced safety policy which was violated in a manner so as not to hold the Respondent responsible for it.
 
 
 37
 He went on to note that Quincy had itself introduced evidence as to training. Subsequently, the ALJ allowed him to introduce further testimony as to training. Furthermore, when Quincy's counsel made one final attempt to object to testimony as to safety training, the ALJ again allowed the testimony.
 
 
 38
 Notwithstanding these exchanges, which indicate that at least by the fourth day the ALJ recognized the relevancy of safety training, and the considerable amount of testimony introduced by both sides as to Quincy's safety training and supervision, Quincy argues it was caught by surprise when the Review Commission based its decision on the inadequacy of this training, and suffered prejudice to its case as a result. It further argues that evidence as to safety training was relevant as to Coutts and Sullivan, who were involved in removing the monuments, but that its use beyond these two employees was improper.
 
 
 39
 The ALJ's own decision weakens Quincy's argument, although Quincy chooses to rely upon it heavily. The ALJ clearly stated the issue to be whether Quincy violated the Act due to "insufficient supervision and training of its employees", and that the Secretary had to show what the employer should have done to prevent idiosyncratic behavior. Slip op. at 5. In light of this statement, it is hard to see how Quincy can claim it was surprised by the Review Commission's consideration of the adequacy of its safety training. It is also difficult to credit Quincy's claim that it was surprised by the Review Commission's decision in view of the substantial amount of space which is devoted in its brief before the Review Commission to arguing that its safety training was adequate. Furthermore, development of the case law had already reached a point which indicated the particular relevancy of safety training by the time the ALJ's decision went before the Review Commission in June, 1976. See, e. g., Brennan v. Butler Lime & Cement Co., supra; National Realty and Construction, supra.
 
 
 40
 A question remains, however, whether the comments by counsel for the Secretary and by the ALJ on the third day of the hearing prejudicially misled Quincy as to the relevance of its safety training program. As already noted, these comments indicated safety training was relevant only to the size of the fine. Quincy argues that as a result it did not present additional evidence as to its training programs, including the testimony of additional supervisory personnel, and current and former production workers.
 
 
 41
 The comments of counsel for the Secretary were indeed misleading and it was not until the final day that he clearly stated the full extent to which safety training was relevant. However, we cannot conclude that Quincy was ultimately prejudiced by these statements. As already discussed, the issue of safety training automatically arises whenever an employer seeks to defend on the basis of idiosyncratic conduct by an employee. Faced with the complaint filed against it, Quincy had ample notice that its safety training would be an issue once it raised its affirmative defense, and should have been prepared to present witnesses accordingly at the hearing. While the discussion on the third day may have temporarily misled Quincy, by the end of the fourth day it should have been clear that safety training was relevant to more than the size of the penalty. In the nearly seven weeks between the fourth and fifth day of hearings, Quincy had ample opportunity to gather more evidence on its training program. Furthermore, the record shows that in fact Quincy did call several witnesses to testify as to its training program, and thoroughly cross-examined all of the Secretary's witnesses on this issue. This evidence demonstrated a significant safety training program existed, whatever the Review Commission's ultimate conclusion was as to its effectiveness in training employees not to remove monuments prematurely. Finally, that Quincy was aware of the importance of the safety training issue is, as already noted, indicated by the space devoted to this issue in its brief before the Review Commission.
 
 
 42
 While the conduct of counsel for the Secretary is not to be condoned, after reviewing the record we conclude that Quincy was not prejudiced by the misleading statements on the third day, the subsequent shift on the fourth and fifth day in the position of counsel for the Secretary, or the Review Commission's decision that training programs were indeed relevant to whether the hazard occurred as a result of idiosyncratic employee conduct.[6] Therefore, we conclude that the Review Commission did not change the basis for the citation, did not prejudice Quincy in correcting the ALJ's legal error, and acted properly in affirming the citation on the grounds that Quincy had not adequately trained its employees as to when monuments could be safely removed.
 
 
 43
 2. The Review Commission's rejection of certain of the ALJ's credibility findings.
 
 
 44
 Quincy argues that the Review Commission improperly disregarded the findings of the ALJ that the testimony of two employee witnesses, Ronald Mahar and Michael Murphy, was not credible. Their testimony, although at times contradictory and vague, could help to support a finding that Quincy's safety training program was inadequate. Because the Review Commission considered this testimony in spite of the ALJ's credibility finding, Quincy argues the Review Commission's decision must be reversed.
 
 
 45
 The Review Commission stated that it disregarded the ALJ's credibility finding because he improperly focused on the foreseeability of the accident as it actually occurred. Such a reason is no reason at all. There is no connection between the ALJ's misinterpretation of the law and his findings, based on personal observations, as to the credibility of a witness. The credibility findings of the person who sees and hears the witnesses be he ALJ, jury, or judge is entitled to considerable deference. While the degree of deference due the ALJ's final decision is related to the importance of credibility in a particular case, the ALJ's decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the ALJ. See NLRB v. Matouk Industries, Inc., 582 F.2d 125, 128-29 and n. 3 (1st Cir. 1978); Brennan v. Gilles Cotting, Inc., 504 F.2d 1255, 1257, 1264 (4th Cir. 1974). Cf. Bangor and Aroostook Ry. Co. v. ICC, 574 F.2d 1096, 1110 (1st Cir. 1978), cert. denied, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978) (little deference due decision of ALJ except on credibility matters when agency makes an independent evaluation that is based on substantial evidence). Consequently we conclude that the Review Commission erred in so cavalierly disregarding the ALJ's credibility findings regarding Mahar and Murphy.
 
 
 46
 However, we also conclude that the error was harmless. Nowhere in its decision did the Review Commission rely upon Mahar and Murphy's testimony. Rather, it explicitly found that even if it accepted the ALJ's credibility findings, "the vast preponderance of the evidence establishes that Quincy did not adequately train its employees in when it was safe to remove monuments. . . ." Slip op. at 13. As is discussed below, this conclusion is supported by substantial evidence. Therefore, we conclude that the failure to accept the ALJ's credibility findings as to Mahar and Murphy was harmless error.
 
 
 47
 3. The alleged lack of substantial evidence to support the conclusion that Quincy's safety training was inadequate.
 
 
 48
 Quincy's argument that there is not substantial evidence to support the conclusion that inadequate training caused the hazard is two-pronged. First, it argues that the Review Commission failed to find that its training program was inferior to the industry standard of care. Second, it argues that there was no evidence that the hazard was caused by deficiencies in training.
 
 
 49
 In arguing that the adequacy of its training program must be measured against the standard of care in the industry, Quincy relies primarily on our decision in Cape & Vineyard Div. of New Bedford Gas v. OSHRC, 512 F.2d 1148 (1st Cir. 1975). This interpretation of Cape & Vineyard is too broad. In that case we held that an OSHA standard requiring an employer to provide protective equipment "wherever it is necessary by reasons of hazards" likely to be encountered through physical conduct, 29 C.F.R. § 1910.132(a), must be read to "penalize only conduct unacceptable in light of the common understanding and experience of those working in the industry".[7] 512 F.2d at 1152. We applied a standard of "reasonable prudent man familiar with the circumstances of the industry" to determine whether action should be taken to protect against the hazard. Id. However, while noting that this standard of conduct would usually be determined by reference to industry practice, we also noted that industry practice might fail to take reasonable precautions against hazards generally known in the industry. Therefore, we emphasized that the standard of care is essentially that of a conscientious expert seeking to prevent all hazards which are reasonably foreseeable. Id. at 1152 and n. 6.
 
 
 50
 Our decision sought primarily to give content to the phrase "wherever it is necessary" in order to avoid a finding that the standard was unconstitutionally vague. Consequently, we focused primarily upon whether the industry as a whole would take precautions against the hazard. At the same time, however, we relied heavily upon National Realty and Construction, supra, where the Court specifically noted that a precaution should be taken whenever it is recognized by safety experts as feasible, even though it is not of general usage in the industry. 160 U.S.App.D.C. at 142 n. 37, 489 F.2d at 1266 n. 37. Consequently, Cape & Vineyard must be read as holding that knowledge of the existence of a hazardous situation must be determined in light of the common experience of an industry, but that the extent of precautions to take against a known hazard is that which a conscientious safety expert would take. Cape & Vineyard, supra, 512 F.2d at 1152; National Realty and Construction, supra, 489 F.2d at 1266. Cf. ITO Corp. of New England v. OSHRC, supra (employer must take all economically feasible steps to enforce safety regulation).
 
 
 51
 Furthermore, we cannot agree with Quincy's position that the measure of the adequacy of its safety program should be that of the industry. Such a standard would allow an entire industry to avoid liability by maintaining inadequate safety training. The purpose of the Act is to require all employers to take all feasible steps to avoid industrial accidents. While the definition of a "recognized hazard" should be made in reference to industry knowledge, by virtue of the definition of the word "recognized", we cannot accept a standard for the precautions which should be taken against such a hazard which is any less than the maximum feasible. Brennan v. Butler Lime and Cement Co., supra; National Realty and Construction, supra.[8]
 
 
 52
 In the present case, it is undisputed that an unsupported web frame constitutes a recognized hazard in the industry. The question then becomes what precautionary steps a conscientious safety expert would take to avoid the occurrence of the hazard. Such precautionary steps almost automatically include an employee safety program. Furthermore, the testimony of Mr. Fiatarone, who was familiar with the industry, was to the effect that a shipbuilding company should have a safety program which instructed employees engaged in erecting web frames on the hazards involved in such work, including the proper time to remove monuments. Based on this evidence, the Review Commission could properly conclude that the precaution of instructing employees as to the proper removal of monuments should be taken whenever feasible, and would be taken by conscientious safety experts. We can find no error, therefore, in the Review Commission's failure to find that Quincy's safety training was below the industry standard.
 
 
 53
 Quincy's final argument is that there is no evidence to support the Review Commission's finding that the hazard occurred as a result of inadequate safety training. Our standard of review, of course, is whether there is substantial evidence to support the Review Commission's finding. 29 U.S.C. § 660(a).
 
 
 54
 Several of the Review Commission's preliminary findings are clearly supported by substantial evidence. For example, the testimony of Paul Sousa and Quincy's own "Tack Welder Rules" demonstrate the absence of a written rule as to when monuments could be removed safely. Sousa's testimony also supports the finding that no safety meeting on the subject had been held in the year that monuments had been used. Several evidentiary items support the finding that Quincy's supervisors were uncertain as to the degree of welding needed to secure the web frames. The testimony of Philip Pitts, a supervisor for Quincy, revealed that he was himself unsure as to the proper time to remove monuments. Pitts stated at the hearing that the proper time was when one side was tack welded to the bottom and the stiffeners tack welded to the longitudinals, yet he had previously testified that the proper time was when Both sides were tacked at the bottom and the stiffeners tacked. Paul Grant, also a supervisor for Quincy, testified that tack welding on one side was sufficient. Yet Ex. C-1 shows that company policy since the accident has been that both sides should be tack welded. The fact that Quincy's own supervisors displayed this uncertainty supports the finding that Quincy's safety program was not effective; if it was effective, this confusion would not exist.
 
 
 55
 The key finding of the Review Commission, however, is that the employees were not properly instructed as to the proper time to remove monuments. In particular, the Review Commission found that Coutts had not been adequately trained. Coutts testified that he had not been instructed as to the proper time to remove monuments, that he did not realize the danger of an unsupported web frame, that he did not make a point of insuring the monuments were in place, and that he had seen other shipfitters remove monuments prematurely. Although Pitts testified that he had instructed Coutts as to when to remove the monuments, in the absence of a credibility finding by the ALJ, the Review Commission could properly choose to believe Coutts. Furthermore, even if Pitts in fact did instruct Coutts, Coutts' testimony indicates that the instructions were not effectively communicated and therefore not clear or adequate. This violates the company's duty to insure that its employees understand proper safety procedures. See Floyd S. Pike Elec. Contractor, Inc. v. OSHRC, 576 F.2d 72, 77 (5th Cir. 1978); Ames Crane & Rental Serv. v. Dunlop, 532 F.2d 123, 125 (8th Cir. 1976); Brennan v. Butler Lime & Cement Co., 520 F.2d at 1018. We find, therefore, that there is substantial evidence that Coutts was not adequately trained in the safe removal of monuments.
 
 
 56
 Quincy argues, however, that the Review Commission improperly concluded that had Coutts been properly trained, he would have checked and realized that the monuments had been removed, and would not have moved the single remaining monument. It is true that there is no evidence that even if properly trained Coutts would have checked for the presence of all four monuments after he began working on the web frame. Indeed, common sense indicates that if they were there initially, he would be reasonable in assuming that they remained there unless he removed them himself. This finding of the Review Commission is therefore unsupported. However, this finding is not necessary to support the Review Commission's conclusion that Coutts was inadequately trained. The parties stipulated that four monuments are needed to support a web frame and therefore removal of one monument creates a hazard. The fact that Coutts moved the single remaining monument at all, whether or not he should have noticed three had already been moved, buttresses the conclusion that he was not adequately trained. It is not necessary to further find he would have checked and discovered the removal of the first three monuments to conclude he was not adequately trained.
 
 
 57
 Quincy objects to the Review Commission's emphasis on the inadequate training afforded Coutts, pointing out that the hazard would have occurred even without Coutt's actions because someone else, apparently Sullivan, had already removed three monuments. Quincy cites Brennan v. OSHRC (Republic Creosoting),501 F.2d 1196 (7th Cir. 1974), for the proposition that the Secretary must show that the employee actually causing a hazard to occur was inadequately trained in order to prove a violation, and that therefore the Secretary must prove Sullivan was inadequately trained. We disagree. Republic Creosoting involved a new employee who had no business participating in the operation in which he was killed, and who had been told to stay away from it. While he had not been trained in the operation in which he was killed, the Review Commission and the Seventh Circuit found there was no reason to do so. The adequacy of the employer's training of those who were supposed to perform the operation in question was not challenged. Here, however, the issue is the training of employees who are supposed to be erecting web frames, and in response to Quincy's defense that the hazard occurred due to idiosyncratic employee conduct the determinative issue is whether Quincy's safety training program is adequate enough to support this defense. The finding that Coutts himself was inadequately trained is important not to show that had he been properly trained the accident would not have occurred, but as part of the evidence supporting a conclusion that Quincy's safety program was generally inadequate. We feel that by showing that Quincy's safety training program with regard to the removal of monuments was generally inadequate the Secretary could rebut Quincy's claim of idiosyncratic employee conduct. It was then incumbent on Quincy to show that in this case the employees who caused the hazard were in fact adequately trained. Quincy did not do so here.
 
 
 58
 It is unfortunate that there is no evidence as to whether Sullivan, who apparently removed three of the monuments, was adequately trained as to the proper time to remove the monuments. However, aside from Coutts, and even excluding the testimony of Mahar and Murphy, there is substantial evidence that the employees generally were not properly trained. This includes the confusion by the supervisors as to the proper time to remove monuments, the lack of any safety meeting on the subject, the testimony of Sousa, Quincy's Chief of Safety, that he didn't know if the proper procedure had been communicated to the shipfitters, and the testimony of Stanley Short, a shipfitter and shop steward, that he had never been instructed regarding the proper use of monuments. This evidence, combined with Coutts' testimony, is sufficient to support a conclusion that Quincy's safety training as to the proper handling of the monuments was inadequate. Once it reached this conclusion, the Review Commission could properly conclude that it was this inadequacy, not idiosyncratic employee behavior, that resulted in the occurrence of the hazard of an unsupported steel plate. Consequently, we conclude that there was substantial evidence in the record for the Review Commission to find that the hazard occurred as a result of inadequate safety training, and not due solely to idiosyncratic employee behavior.
 
 Conclusion
 
 59
 We conclude that because Quincy presented a defense of idiosyncratic employee behavior, the Review Commission properly based its decision on the inadequacy of Quincy's safety training program, and that Quincy did not suffer any prejudice as a result. Furthermore, while the Review Commission improperly ignored certain of the ALJ's credibility findings, this action was harmless. Finally, we find there was substantial evidence in the record to support the Review Commission's conclusion that Quincy's safety training was inadequate to prevent the occurrence of the recognized hazard of an unsupported web frame. Therefore, we affirm the decision of the Review Commission.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 The general duty clause provides that
 (a) each Employer
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees . . . .
 29 U.S.C. § 654.
 A "serious violation" exists
 (j) . . . if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 29 U.S.C. § 666(j).
 
 
 [2]
 Some of the witnesses testified that both sides should be tack welded to the bulkhead before removing the monuments. We need not decide whether this is necessary inasmuch as the frame was not tack welded to the longitudinals, and all agreed that this was a necessary step before removal of the monuments
 
 
 [3]
 The phrase "contrary to standard procedure" was omitted from the complaint. Because Quincy admitted that removal was contrary to standard procedure, the ALJ found this change immaterial
 
 
 [4]
 Quincy cites Cornell & Co. v. OSHRC, 573 F.2d 820 (3d Cir. 1978) and Western Waterproofing Co. v. Marshall, 576 F.2d 139 (8th Cir. 1978), cert. denied, 439 U.S. 965, 99 S.Ct. 452, 58 L.Ed.2d 423 (1978) in support of its argument that the Review Commission acted improperly by changing the basis for the citation. Both these cases involved situations where an attempt was made, either by the Secretary before the hearing (Cornell) or by the Review Commission after the hearing (Western Waterproofing), to change the complaint to allege violation of a different standard than that in the original complaint. Because the Review Commission did not change the grounds for the citation, neither of these cases is applicable
 
 
 [5]
 Indeed, if he had so held, he would have been incorrect as a matter of law. See, e. g., National Realty and Construction, supra
 
 
 [6]
 Quincy suggests that in order to challenge the deficiency in its safety training program, the Secretary should have mentioned in the citation that the employees were improperly trained. Brief for Appellant at 17 n.3. While this might be desirable to avoid the confusion engendered in this case, we do not think it is necessary when, as here, the employer itself puts its safety training at issue by pleading the affirmative defense of idiosyncratic employee conduct
 
 
 [7]
 Although Cape & Vineyard involved a specific safety standard, not the general duty clause involved here, we found the duty imposed by the protective equipment standard to be analogous to that imposed by the general duty clause. 512 F.2d at 1152
 
 
 [8]
 A decision of the OSHRC issued since oral argument, Secretary v. S&H Riggers & Erectors, Inc., OSHRC No. 15855 (April 13, 1979), also interpreted our decision in Cape & Vineyard in this manner. Slip op. at 11. While that case involved a violation of a specific standard, not of the general duty clause, OSHRC answered an argument similar to that raised by petitioner here by holding that
 industry cannot be permitted to set its own standards for protecting employees when those standards fail to adequately protect employees exposed to safety and health hazards recognized by the reasonable person familiar with the facts. Cape & Vineyard Division, supra. . . .