10-0123-ag
*Public Utilities Maintenance, Inc. v. Secretary of Labor*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 29th day of March, two thousand eleven.

PRESENT:     JOHN M. WALKER, JR.,
             BARRINGTON D. PARKER,
             DEBRA ANN LIVINGSTON,
                          *Circuit Judges*.

_____

PUBLIC UTILITIES MAINTENANCE, INC.,
            *Petitioner*,

        -v.-                                    No. 10-0123-ag

SECRETARY OF LABOR,
            *Respondent*.

_____

                        JOYCE J. SUN, Georgoulis & Associates, PLLC, New York, NY, *for Petitioner*.

                        RONALD J. GOTTLIEB, Attorney, U.S. Department of Labor, Washington, DC (M. Patricia Smith, Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, Heather R. Phillips, Counsel for Appellate Litigation, *on the brief*), *for Respondent*.

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the petition for review is **DENIED**.

Petitioner Public Utilities Maintenance, Inc. ("PUMI") petitions this Court for review of a November 17, 2009, Decision and Order of Administrative Law Judge Covette Rooney ("the ALJ") of the Occupational Safety and Health Review Commission ("OSHRC"), which became a final order of OSHRC on December 31, 2009, when OSHRC declined to direct it for review. The order upheld a citation issued by the Secretary of Labor ("the Secretary") to Petitioner for violation of 29 C.F.R. § 1910.269(*l*)(2). On appeal, Petitioner claims both that the relevant regulation does not apply to it and that certain findings of the ALJ were not supported by substantial evidence. We assume the parties' familiarity with the underlying facts, procedural history of the case, and issues on appeal.

This Court "must affirm the Commission's findings of fact if they are 'supported by substantial evidence on the record considered as a whole.'" *D.A. Collins Const. Co. v. Sec'y of Labor*, 117 F.3d 691, 694 (2d Cir. 1997) (quoting 29 U.S.C. § 660(a)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Moreover, "[t]he Secretary's interpretations of her regulations are . . . entitled to 'controlling' deference unless those interpretations are 'plainly erroneous or inconsistent with the regulation.'" *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 153 (2d Cir. 2010) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). In particular, when "embodied in a citation," the Secretary's interpretation of her regulations "assumes a form expressly provided for by Congress" and therefore "is as much an exercise of

delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard." *Martin v. OSHRC*, 499 U.S. 144, 157 (1991). The Secretary's "less formal means of interpreting regulations prior to issuing a citation," like agency enforcement guidelines, are "not entitled to the same deference" as citations but "are still entitled to some weight on judicial review." *Id.*

Petitioner's first contention is that its activities are not covered by 29 C.F.R. § 1910.269(*l*)(2), the regulation at issue in this case. The regulation, which "applies to work on exposed live parts, or near enough to them, to expose the employee to any hazard they present," 29 C.F.R. § 1910.269(*l*), provides that "[t]he employer shall ensure that no employee approaches or takes any conductive object closer to exposed energized parts than" the "minimum approach distance" ("MAD") — which is three feet for wires at the voltage involved in this case — of the energized part unless either the employee or the energized part is properly insulated. *See id.* § 1910.269(*l*)(2). The regulation states, however, that it does not apply to "construction work, as defined in § 1910.12 of this Part." *Id.* § 1910.269(a)(1)(ii). Petitioner contends that its work painting electrical transmission towers falls within the regulatory definition of "construction work" as "work for construction, alteration, and/or repair, including painting and decorating," *id.* § 1910.12.

The interpretation of the regulation advanced by the Secretary of Labor in the citation at issue here is not plainly erroneous or inconsistent with § 1910.269(*l*)(2). Indeed, it is consistent with OSHRC's longstanding interpretation of the regulatory definition of construction work as limited to "actual construction work or to related activities that are an integral and necessary part of construction work. Activities that could be regarded as construction work should not be so regarded

3

when they are performed solely as part of a nonconstruction operation." *B. J. Hughes*, 10 O.S.H. Cas. (BNA) 1545, 1547 (OSHRC 1982). Thus, while painting performed as a part of a construction project would be considered construction, painting performed as maintenance, as the ALJ found was true of the work performed by Petitioner in this case, would not be. *See Gulf States Utilities Co.*, 12 O.S.H. Cas. (BNA) 1544, 1546-47 (OSHRC 1985) (holding that the definition of construction work for this statutory subpart does not include maintenance work). While Petitioner asserts that the lack of an explicit reference to painters in the regulatory history of this standard is indicative of an understanding they would not be covered by it, extending coverage of this provision to employees tasked with painting energized electrical power transmission facilities is entirely consistent with the concern expressed in the regulatory history that "[e]mployees performing operation or maintenance work on electric power generation, transmission, or distribution installations are not adequately protected by current OSHA standards." Occupational Safety and Health Administration: Electric Power Generation, Transmission, and Distribution; Electrical Protective Equipment: Final Rule, 59 Fed. Reg. 4320, 4320 (Jan. 31, 1994).

Petitioner also claims that an OSHA directive, issued in 2003 to assist OSHA compliance personnel performing inspections at power generation, transmission, and distribution facilities, indicated that painting constituting "a complete repainting job . . . on a major portion of a structure" should be considered construction work. *See* OSHA Instruction, CPL 2-1.38 (June 18, 2003). Although the Secretary correctly notes that the same section of the directive expressly makes clear that "maintenance painting" is covered by § 1910.269(*l*)(2), the directive does clearly classify a "complete repainting job" as construction. However, the interpretation embodied in the Secretary's

citation in this case is entitled to greater deference than the informal interpretation offered in the directive. *See Martin*, 499 U.S. at 157. Moreover, the directive, although it supports PUMI's position here, is itself inconsistent with other agency authority more directly applicable to the question before us. Thus, a publicly available opinion letter from OSHA's Directorate of Construction, issued on May 11, 1999, expressly addresses the question whether painting a power pole is maintenance or construction, stating that such work is maintenance, even if performed at ten to twenty year intervals, as in this case. *See* Letter from Russell B. Swanson, Director, Directorate of Construction, to J. Nigel Ellis (May 11, 1999). Indeed, despite the position it takes in this proceeding, PUMI's own safety guidelines required its employees to comply with § 1910.269(*l*)(2). Under these circumstances, we cannot say that the Secretary's interpretation of her own regulation is plainly erroneous or inconsistent with the regulation.[1]

Petitioner next asserts that the ALJ's conclusion that it had constructive knowledge of the violative condition, an element of the Secretary's *prima facie* case of a violation, *see N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 105 (2d Cir. 1996), was not supported by substantial evidence. An employer's knowledge or constructive knowledge of a violative condition can be "satisfied by proof either that the employer actually knew, or 'with the exercise of reasonable

---

[1] Petitioner claims in its reply brief that the fact that it also painted aerial numbers on the towers should make its work the "alteration" or "improvement" of the towers, so as to constitute construction work. However, they did not raise this issue in their opening brief, *see Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."), nor did they do so in their Petition for Discretionary Review to OSHRC, *see D.A. Collins Const. Co.*, 117 F.3d at 694 ("[N]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). As a result, we will not address this argument here.

diligence, could have known of the presence of the violative condition.'" *Id.* (quoting *Pride Oil Well Serv.*, 15 O.S.H. Cas. (BNA) 1809, 1814 (O.S.H.R.C. 1992)). In finding that Petitioner could, with the exercise of reasonable diligence, have known of the violative condition, the ALJ relied on the following facts: (1) that although Petitioner was aware that the tower on which the accident occurred posed a special danger due to the close proximity of energized parts to the tower frame to be painted, the company's supervisors did not themselves measure the distances between the frame and the energized parts to determine how close to the energized lines its employees would be working, (2) that the company instead gave the workers on the day of the accident only a general instruction regarding the MAD requirement and relied on them to determine if the tower was safe to paint, and (3) that despite the fact that Petitioner's own safety plan called for a safety observer to monitor each tower being painted, on the day of the accident a single foreman was responsible for monitoring both towers.

Petitioner does not seriously challenge any of the factual findings on which the conclusion that it failed to exercise reasonable diligence was based. It asserts first that the government failed to demonstrate before the ALJ that the accident victim, Carlos Mejia, came too near to the energized wires, arguing that this alleged failure was also relevant to whether the Secretary had shown its knowledge of the violative condition. However, it admitted that Mejia suffered an electrical shock while painting the tower, and there was testimony that the electricity at the voltage of the wires at issue here could jump at most one to two inches — far less than the minimum approach distance of three feet. It was also the initial conclusion of both Mejia's project manager and his foreman that Mejia had contacted or came within the MAD of the wire on the day of the accident. This evidence

is clearly sufficient for a reasonable person to accept as adequate to support the conclusion that Mejia came within three feet of the energized tower part.

Petitioner also asserts more broadly that the ALJ's conclusion that it had constructive knowledge improperly seeks to fault it either for having its employees paint any part of an energized electrical transmission tower when one part of the tower is too near to an energized line or for not having taken "safety measures beyond those that are reasonable and feasible," *N.Y. State Elec. & Gas Corp.*, 88 F.3d at 103. Here, however, neither the ALJ nor the Secretary before us claims that Petitioner should have prohibited its employees from painting the tower altogether.[2] Rather, they argue that in fact it could have taken other reasonable and feasible measures that would have alerted it to the violative condition at issue.

As the ALJ noted in this case, OSHRC has previously indicated that "reasonable diligence" for the purposes of constructive knowledge involves, among other factors, an employer's "obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence." *North Landing Const. Co.*, 19 O.S.H. Cas. (BNA) 1465, 1472 (O.S.H.R.C. 2001) (quoting *Frank Swidzinski Co.*, 9 O.S.H. Cas. (BNA) 1230, 1233 (O.S.H.R.C. 1981)). Here, the tower on which the injury occurred posed a special danger, given the particularly close proximity of energized parts to the tower frame being painted. Despite Petitioner's contention,

_____

[2] The Secretary does correctly note, however, that while Petitioner suggests that de-energizing the tower before painting it here would have been infeasible, its own site-specific safety plan provides that before a tower is painted a foreman and crew will "conduct a documented assessment to determine if painting can be accomplished without encroaching on the MAD. When structures pose a concern, they will be noted, and painted at such time as the line can be taken out of service."

there was substantial evidence for the ALJ's finding that, in spite of this special danger, the foreman on the day of the accident gave only a general instruction to the workers to be careful and to avoid getting too near the wires, without specifically mentioning the three-foot minimum approach distance requirement. While the foreman testified that he mentioned the specific three-foot distance on the day of the accident, the ALJ correctly noted that the two other painters who testified simply indicated that MAD had been discussed. Moreover, even if Petitioner's foreman had mentioned the three-foot requirement specifically, the employees were still in the position of assessing for themselves what parts of the towers were too close to the energized parts to be painted safely, with no measuring devices to aid in their assessment. As the Secretary notes, PUMI's safety plan itself called for its foreman and painting crew to assess and document whether a tower could be painted without encroaching on the MAD. Here, no such assessment was performed, even though one beam of the tower came so close to an energized loop on the tower that it simply could not be painted in its entirety without violating the MAD requirement and another came within fifty-eight inches of the same loop.

Finally, we have noted in the past that, "[d]epending upon the circumstances, close supervision may or may not be reasonably necessary to attain compliance with safety rules." *N.Y. State Elec. & Gas Corp.*, 88 F.3d at 109. Here, given the clear dangers of the work in which Petitioner was engaged — with a painting protocol that would put its employees near or within the MAD in the course of painting the tower at issue — Petitioner's safety plan itself called for an observer for each tower on which a crew was working. At the time this accident occurred, however, not only was there a single observer for crews working on two towers, the designated observer was

8

himself tidying up his truck instead of observing either team. Under these circumstances, the ALJ's finding that the Secretary of Labor had established Petitioner's constructive knowledge of the violation of OSHA's regulatory standard is supported by substantial evidence.

PUMI's final contention is that even if it is found to have had constructive knowledge of the breach of OSHA's MAD standards, it should have been found to have established its entitlement to the affirmative defense of unpreventable employee misconduct. This defense has four elements. "[A]n employer must prove that (1) it established work rules to prevent the violation; (2) these rules were adequately communicated to the employees; (3) it took steps to discover violations; and (4) it effectively enforced the rules when infractions were discovered." *D.A. Collins Const. Co.*, 117 F.3d at 695 (footnote omitted). The employer bears the burden of making out this defense. *See id.* The ALJ found that while Petitioner had work rules designed to prevent its painters from encroaching upon the MAD, it failed to implement these rules effectively.[3]

Petitioner notes that it does have work rules addressed to MAD requirements and that these rules were communicated to its employees, claims which the Secretary does not contest except as to the form this communication took on the day of the accident. With respect to its implementation of these work rules, Petitioner also asserts that it took reasonable steps to monitor for unsafe working conditions, citing the twice-a-week visits made to the job site by its project supervisor, its industry certifications and excellent prior safety record, and the high experience level of the victim in this

[3] As we have noted, the defense involves an inquiry into the adequacy of an employer's safety policy that overlaps to some degree with the constructive knowledge inquiry performed in assessing the Secretary's *prima facie* case of a violation. *See N.Y. State Elec. & Gas Corp.*, 88 F.3d at 106.

case. These circumstances, it suggests, rendered constant supervision of Mejia unnecessary, as an employee "need not be supervised every second, especially as the employee becomes more experienced and aware of proper safety procedures." *Gen. Dynamics Corp., Quincy Shipbuilding Div. v. OSHRC*, 599 F.2d 453, 459 (1st Cir. 1979).

The ALJ did not, however, fault Petitioner for not providing constant supervision. Rather, the ALJ found that PUMI failed to provide a reasonable level of supervision given the danger of the work involved and the ease with which Mejia could inadvertently approach too near to an energized part of the tower in the area in which he was working. While Petitioner claims that delegation of responsibility to Mejia to identify dangers himself was appropriate and indeed was among his responsibilities as crew leader, this argument again ignores the fact that the site-specific safety plan called for the foreman and crew to perform a documented assessment of the tower together, which was not done here.[4] Moreover, it is unclear how Mejia's experience or his status as crew leader would help him avoid violating the MAD requirement, where the concern is not that he might forget or ignore his training but rather that he was painting an area of the tower in which even the slightest inadvertent movement could bring him within the minimum approach distance of an energized part.

---

[4] Petitioner also asserts that Mejia had been designated a "Competent Person," such that under the site-specific safety plan, he was responsible not just for identifying and addressing hazards but also for providing supervision for tower climbing work. However, the evidence they cite for this claim indicates only that Mejia *could* have been designated as a Competent Person by Petitioner's Project Manager, not that he in fact had been. Furthermore, if Mejia did in fact have supervisory responsibility to monitor painting on the tower on which he was injured, his constructive knowledge of his own violation of the MAD requirement would be imputable to Petitioner, *see N.Y. State Elec. & Gas Corp.*, 88 F.3d at 110, and his failure to enforce the work rules related to these requirements would permit an inference that the rules had not been adequately enforced, *see D.A. Collins Const. Co.*, 117 F.3d at 695.

10

Further, as already noted, he was doing so without the monitoring of a safety observer required by the site-specific safety plan. While Petitioner also argues that it did enforce its work rules upon discovering violations, including once imposing discipline on Mejia himself, the past enforcement of some work rules does not alter the fact that the implementation of the rule related to MAD standards was severely flawed on the day of the accident here. There was thus substantial evidence supporting the conclusion that Petitioner's safety plan was not adequately implemented in this case and as a result it failed to establish its entitlement to an affirmative defense of unpreventable employee misconduct.

We have considered all of Petitioner's remaining arguments and find them to be without merit. For the foregoing reasons, the petition for review is hereby **DENIED**.


FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk