Peter J. BRENNAN, Secretary of
Labor, Petitioner,

v.

BUTLER LIME AND CEMENT
COMPANY

and

Occupational Safety and Health Review
Commission, Respondents.

No. 74–1963.

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1975.

Decided Sept. 5, 1975.

Stephen F. Eilperin, Harry R. Silver, Dept. of Justice, Washington, D. C., William J. Kilberg, Sol. of Labor, Michael H. Levin, Atty., U. S. Dept. of Labor, Washington, D. C., for petitioner.

Clifford C. Kasdorf, Russell M. Ware, Milwaukee, Wis., for respondent.

Before PELL and STEVENS, Circuit Judges, and PERRY, Senior District Judge.*

PELL, Circuit Judge.

The Secretary of Labor has petitioned this court to review the decision of the Occupational Safety and Health Review Commission (Commission) in the case of Butler Lime & Cement Company (Butler), OSAHRC Docket No. 855 (Sept. 24, 1974).[1] In that decision, the Commission, by a 2–1 vote, affirmed an administrative law judge's order that had vacated a citation and proposed penalty issued by the Secretary to Butler. The citation alleged a "serious" violation of section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2).[2]

I

Butler is a Wisconsin corporation that sells and delivers brick, mortar, and other building materials to contractors in the Milwaukee area. To make these deliveries, Butler employs 24 drivers to operate its fleet of 24 vehicles, which includes two brick trucks. The brick trucks are flat-bed vehicles equipped with steel pedestals mounted with mobile crane booms for the loading and unloading of the pallets on which building materials are shipped. These booms can be swung in wide arcs and can be raised nearly vertical from their horizontal rest position. To unload, the driver of such a brick truck raises the boom to the desired angle and then through the motion of a "trolley," a device which moves inside the boom, he places the hauling cable over the center of the material to be lifted. Thus the crane boom enables one man to drive the load from the yard to the customer's premises and there unload it without assistance.

On March 15, 1972, Butler employee Douglas Kapperman was ordered to deliver a load of bagged cement and lime to Commercial Construction Company at a construction site in Milwaukee County. The site, as is usual in the county, contained overhead power wires. Because of grading, the wires in some areas of the site were lower than was typical. The vehicle Kapperman drove was the smaller of the two Butler brick trucks; it was 25 feet long and its crane measured 20 feet. Kapperman had driven Butler cement and dump trucks for 10

---

* Senior District Judge J. Sam Perry of the Northern District of Illinois was sitting by designation.

1. Our jurisdiction is pursuant to 29 U.S.C. § 660.

2. 29 U.S.C. § 666(j), section 17(k) of the Act, explains what a "serious" violation is.

    " . . . a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment *unless* the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." (Emphasis added.)

years but had operated this brick truck only since December 1971.[3] With his truck boom horizontal, Kapperman drove onto the site between two partly-completed apartment buildings, passed under a series of 4800-volt overhead electric lines which ran between the buildings, and stopped near a cement mixer operated by two Commercial Construction Company employees. Kapperman then turned his truck around and parked it directly under the overhead lines. This position placed the boom eight feet from the lines and required that the boom be raised over and above the wires before unloading could take place. It was Butler's policy that a driver should use his own judgment where to place the material delivered if the driver had been given no special instructions as to the delivery spot.

When Lewis, one of the Commercial Construction Company employees, asked Kapperman whether "he wasn't awful close to the wires," Kapperman just looked at him and continued to unlimber his boom. The two Commercial workers immediately went to the other side of one of the unfinished buildings because, "[i]f he touches those wires maybe we could get it, too." When the men returned ten minutes later, Kapperman was lying dead beside his truck. The crane boom either had touched the power lines or had come near them, with the result that the electricity had passed from the lines through the boom and thence had fatally injured Kapperman.

---

**3.** It is not clear from the record the extent of Kapperman's experience with brick trucks prior to December 1971.

**4.** The citation read in part:

"Employer failed to provide that a wheel mounted crane not be operated proximate to, under, over, by, or near powerlines (rated at 4,800 volts) unless the minimum clearance between the lines and any part of the crane or load be 10 feet. (Some part of the crane or apparatus came very close to or hit, the powerlines at the construction site near 78th and Sheridan Streets, resulting in the electrocution of the operator.)"

II

After an inspection of Butler's yard and the job site following the Kapperman incident, the Secretary of Labor issued Butler a citation[4] for a serious violation of section 5(a)(2).[5] Butler had allegedly failed to comply with safety standard 29 C.F.R. 1910.180(j), which provides in pertinent part:

(j) *Operating near electric power lines* —

(1) *Clearances.* Except where the electrical distribution and transmission lines have been deenergized and visibly grounded at point of work or where insulating barriers not a part of or an attachment to the crane have been erected to prevent physical contact with the lines, cranes shall be operated proximate to, under, over, by, or near powerlines only in accordance with the following:

(i) For lines rated 50 kv. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet.

. . . . .

(4) *Overhead wires.* Any overhead wire shall be considered to be an energized line unless and until the person owning such line or the electrical utility authorities indicate that it is not an energized line.[6]

Butler was also served with a $550 proposed penalty for this violation and

---

**5.** Section 5(a)(2), or, 29 U.S.C. § 654(a)(2), provides:

"(a) Each employer—

. . . . .

(2) shall comply with occupational safety and health standards promulgated under this chapter."

Butler was also cited for non-serious violations; it did not contest those alleged violations.

**6.** Wisconsin law includes the same standard.

was ordered to abate it immediately. The company timely contested the citation and proposed penalty, and a hearing was subsequently held before an OSAHRC administrative law judge. At the hearing, Butler did not deny that on March 15, 1972, Kapperman had so maneuvered his truck that the crane boom very closely approached power lines, with the result that Kapperman was electrocuted. Nor did Butler deny that its employee, in so placing his truck and crane, had been in serious violation of standard 1910.180(j). It did deny that it could have known with the exercise of reasonable diligence that Kapperman would engage in such hazardous conduct. It contended that it had adequately trained and instructed Kapperman in the safe operation of the crane.[7]

In his decision of January 19, 1973, the administrative law judge set out the following. Butler is one of six corporations which are owned by the same shareholders and which "work together." The corporations seek to keep abreast of the OSHA and Wisconsin regulations that they deem applicable to their business. The OSHA and Wisconsin rules forbidding the operation of a crane boom within ten feet of power lines are "of special local importance since overhead wires are the rule rather than the exception in Milwaukee County." At the time in question, a director and treasurer of Butler, Ross Prange, was in charge of the corporations' safety program. Because of two past incidents, Prange was particularly alert to the danger of operating cranes near high tension wires. At the hearing, Prange was asked:

"Q. To your knowledge in the instructions given to drivers who operate brick trucks does the person giving the demonstration or the instruction indicate by the use of the boom what ten feet of distance would be? A. To my knowledge that phrase ten feet would not come up.

"Q. I see. A. Because we want them to stay away not . .." (Tr. 278–79)

There had been no meetings for drivers since a group-wide safety meeting in 1957 and a group-meeting in 1959 or 1960 at which safety was one of the subjects discussed. Prange stated that other procedures took the place of formal periodic meetings about safety. In the case of a new man, or of a man changing a piece of equipment, or of a man "rebidding" for a job, the worker would receive two or three days of coaching in the general operation of the vehicle and in safety procedures. Because there were so few brick truck drivers and so few changes in their roster, the training procedure for them was less routine. A new brick truck driver would be coached by an experienced driver or by a qualified member of the supervisory group. The new driver would be warned about high tension wires each time he took out a vehicle; the warning would be repeated whenever he received a disciplinary letter or other reprimand. In addition, according to Prange, safety was stressed in the day-to-day contacts between management and the drivers. These communications from management usually occurred through the dispatchers, who, one or more times each day, handed a delivery order to each driver on duty.

As part of its safety program, Butler displayed a poster, 17 inches by 22 inches, on which was set forth in bold type, with headings in red, the twenty-two general safety rules of the Construction Industry Safety Council, Suppliers Group. Rule 16 read: "Crane Boom, under no circumstances shall be operated within ten feet of power lines." This poster appeared for six months prior to March 15, 1972, on the bulletin board in Butler's office, near the time clock where drivers punched in and out and near the dispatcher's desk. This bulletin board also was used for personnel notices

---

7. Butler also challenged the jurisdiction of the Commission. That issue is not before us.

from Butler and from the union and for individual messages to and from the drivers.

Prange testified that he was assisted in safety matters by the manager and the manager's assistant. However, Prange regarded safety instruction in each yard as one of his own duties, and he inspected each yard, including Butler, once a week.

In 1968, when Butler asked Kapperman to qualify as a relief driver on brick trucks, no experienced brick truck driver was available to train him. However, the assistant manager, Mislang, was qualified by skill to do so, and he coached Kapperman on the handling of the boom. The two men went to a site where Mislang demonstrated how to use the boom. He "[p]ointed out the wires," buildings, overhangs, and a fence. He warned Kapperman "not to get too close," but he did not mention ten feet nor did he tell Kapperman that electricity can arc. Mislang was satisfied with Kapperman's progress and skill as a crane operator and made no other trips to assist him or to observe his work.

Mislang testified that he emphasized to drivers the standing rule that a driver who felt that he might be getting "too close" was to call the office on the radio telephone located in the cab of the truck.

At the end of December 1971, when Kapperman was approved as a regular brick truck driver, the manager talked with him about safety precautions. This was the last time that the manager discussed safety with Kapperman; and he did not recall that anyone else later had. The December 1971 talk lasted fifteen minutes and took place in the office.

" . . . We talked about overhead wires, we talked about roofs, we talked about everything you can imagine—just be careful with this piece of equipment, watch what you are doing, if there is any question, jump on the radio, call us, we will check . . .." (Tr. 218)

Kapperman asked a few questions about the truck, and the conference ended.

The testimony of Prange, the manager, and Mislang sharply conflicted with that of three other witnesses: Butler's dispatcher, the driver of the larger brick truck, and the yard steward. According to the dispatcher, during the four to six months prior to March 1972, he had never mentioned to any driver the safety rules as to wires located at the site where Kapperman's accident later occurred. The brick truck driver testified that he had not received any demonstration or other instruction on the operation of the truck. It was only after Kapperman's accident that the manager told him to keep away from wires. The driver had made several deliveries to the site where Kapperman later died and no one had warned him of the wires there. He also stated that safety rules and instruction at Butler were limited to hard hats and yard housekeeping; there was no mention of wires as a hazard in the operation of crane booms. (Butler's manager contradicted the driver's testimony about the lack of safety instructions except for the necessity of hard hats and housekeeping. He claimed that he had spoken with the driver for ten or fifteen minutes once about other safety measures. However, he did not recall whether he had mentioned overhead wires.)

The yard steward's testimony contradicted the statement of Prange that all new drivers received instruction in safety procedures and Butler's safety rules. His remarks concerned cement truck drivers only, but cement trucks were Butler's primary equipment. The yard steward further testified that the only oral safety instructions given new drivers concerned the wearing of hard hats. Additional safety information depended upon how much a man could glean from the demonstration he witnessed regarding the operation of the vehicle.

As this summary reveals, the evidence as to the adequacy of Butler's safety program was sharply split. Yet the administrative law judge failed to make a clear finding on this important issue:

> "No evidence indicates that Butler knew of the position in which Kapperman had placed himself and no evidence indicates that it could have known with the exercise of reasonable diligence. The accident occurred *not because Butler failed to give Kapperman adequate safety training, if indeed Butler so failed*, but because Kapperman failed to use common sense and judgment . . .." (Emphasis added.)

The law judge instead emphasized three other factors. First, Kapperman had "a good record as a driver and as an employee, and a good safety record. . . Kapperman had an improving safety record with respect to auto accidents and personal injuries." Second, there was no evidence that Kapperman had acted other than normally on March 15, 1972, before he left to make the ill-fated delivery. Third, although Kapperman had been given no special warnings, about wires and no special instructions as to the exact place within the site where he was to unload, he had chosen a position that required a procedure the danger of which was obvious to others. In the four-to-six month period preceding the accident, Butler had ordered 45 to 100 deliveries to the same construction site and had received no report from a driver regarding actual or possible danger or any other difficulty. Kapperman himself had made three deliveries to the site in February 1972. All apparently had been without incident.

The law judge therefore concluded that "no evidence indicates that Butler was on notice of [Kapperman's] lack of common sense and judgment. . . . [T]here was no notice to Butler that Kapperman would choose so obviously dangerous a position from which to attempt to unload." The judge held that, under these circumstances, the act of the employee that breached the regulation would not be attributed to the employer. Kapperman's act "was a gross aberration from safe practice, which aberration was reasonably unforeseeable in the light of the employee's record and the task upon which he was employed." [8] The law judge vacated the citation and notice of proposed penalty.

### III

On review, Commission Chairman Moran affirmed the law judge's decision without opinion. Commissioner Van Namee concurred in the disposition of the case, "but for different reasons." Although he interpreted the law judge's decision as being based upon a finding that Butler's safety program was adequate, he concurred with Chairman Moran because "at no time did this operator, his fellow deliverymen, or any supervisor determine that a dangerous condition existed at the site. Moreover, one simply cannot ignore the fact that the operator involved . . . was given an express warning of the existence of overhead wires as he operated the boom."

Commissioner Cleary dissented. He alone focused on Butler's safety instructions, which he deemed inadequate. He pointed out that Butler's manager, in the course of his fifteen-minute chat with Kapperman, had not explained to the

---

8. The law judge mentioned a line of Commission decisions where the Commission refused to attribute to the employer the act of an employee in breach of a regulation or in breach of 29 U.S.C. § 654(a)(1) because "the employee's act was forbidden by the employer's work rule, *generally effectively enforced* . . .."

(Emphasis added.) That the law judge did not base his order on this line of decisions is further evidence that he made no finding as to the adequacy or inadequacy of Butler's safety program.

driver that electricity can arc nor had he instructed Kapperman to keep his truck boom at least ten feet away from power lines. The Commissioner stated that "in finding that the accident occurred because Kapperman failed to use common sense and judgment, I believe that the administrative law judge erroneously shifted responsibility for compliance from [Butler] to the electrocuted employee, Kapperman." The display of the safety poster and the presence of the two-way radio in the truck cab were insufficient methods of implementing the safety standards. In sum, Butler had violated section 5(a)(2) when its employee put the truck boom within eight to ten feet of the 4800-volt power lines in noncompliance with the standard. This was a "serious" violation. A reasonably diligent employer would have foreseen the danger to Kapperman.

**IV**

29 U.S.C. § 660(a) provides that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." We discern no actual finding of fact as to Butler's safety program. But the crux of this case is the adequacy or inadequacy of that safety program. Only the dissenting Commissioner spoke to the point.

The decisions of the administrative law judge and of the Commission majority were based on the conclusions that the fatal accident was caused by Kapperman's "lack of common sense," i. e., negligence, and that Butler could not reasonably have known that Kapperman would undertake the conduct which caused his death. We note, first, that if an employee is negligent or creates a

violation of a safety standard, that does not necessarily prevent the employer from being held responsible for the violation. *See, e. g., REA Express, Inc. v. Brennan*, 495 F.2d 882, 825 (2d Cir. 1974); *National Realty & Constr. Co. Inc. v. OSAHRC*, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1260 n. 6, 1266 n. 36 (1973). True, an employer is not an insurer under the Act. But an employer is responsible if it knew or, with the exercise of reasonable diligence, should have known of the existence of a serious violation. A particular instance "of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous nature, at the moment of its occurrence, . . . [where] such conduct *might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees.*" *National Realty, supra,* 489 F.2d at 1266–67 n. 37 (emphasis added).

Second, the decisions at the Commission level address themselves to the foreseeability of the incident as it actually occurred rather than to the foreseeability of the general danger of coming within ten feet of power lines, i. e., the danger which was the subject of promulgated standard 1910.180(j). "[S]ection 17(k) [does not] requir[e] any actual death or physical injury for a violation to occur." *Brennan v. OSAHRC*, 494 F.2d 460, 463 (8th Cir. 1974). An employer must take reasonable precautionary steps to protect its employees from reasonably foreseeable recognized dangers that are causing or are likely to cause death or serious physical injury. And precautionary steps, of course, include the employer's providing an adequate safety and training program. *See* the "general duty" clause, 29 U.S.C. § 654(a)(1).[9] *See also Lebanon Lumber*

---

**9.** An employer's duties under the Act flow from two sources. First, under 29 U.S.C. § 654(a)(2), it must conform to the detailed health and safety standards promulgated by the Secretary of Labor under 29 U.S.C. § 655. (See n. 5, *supra.*) Second, where no promul-

gated standards apply, the employer is subject to the general duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29

*Co.,* OSAHRC Docket No. 184 (March 19, 1973), reported in 1 (BNA) OSHC 1165.

■ *Brennan v. OSAHRC,* 501 F.2d 1196 (7th Cir. 1974), upon which Butler relied at oral argument before us, does not alter what we have said above. The case is factually inapposite: the employee killed there had been told to stay away from the trucks; it was *not* his job to load or unload the railroad ties from the trucks. Rather, he was supposed to sort and stack the ties after others had completed the unloading process. Further, in *Brennan,* we stated:

"Whether training is necessary and the amount of any training required will depend on a number of factors, such as the experience of the employee in the particular field of work, the extent of the employee's participation in the operation in question, and the complexity and danger involved in the operation. *Where an employee is directly participating in a job, the employer may well, as the Commission noted, have a duty under the Act to instruct him on the safe procedure for handling the job.* On the other hand, the Commission accurately recognized that training may be unnecessary for an employee who is wholly disassociated with the operation in question and who would not be foreseeably exposed to danger." 501 F.2d at 1200. (Emphasis added.)

In sum, whether a serious violation of the standard was foreseeable with the exercise of reasonable diligence depends in great part on whether Butler's employees, Kapperman particularly, had received adequate safety instructions. If Butler failed to give adequate warning to its employees of the need to stay at least ten feet away from power lines, in accordance with standard 1910.180(j), then an accident occurring because a

driver violated the regulation would seem to have been foreseeable.

In this respect, it appears to us the possibility that electricity could be transmitted from the wires into the boom by arcing is of substantial significance. A driver unaware of this possibility might well be of the belief that he was operating with safety so long as actual physical contact between the wires and the boom did not occur. Unless and until he was aware of the arcing possibility hazard, he reasonably might regard the 10 foot safety rule, assuming it had been brought to his attention, as a fuddy-duddy, over-abundance-of-caution restriction. The situation is comparable to the small boy's interpretation of a parental admonition of "don't go near the railroad tracks" as meaning only "stay off the tracks." Until his warning includes bringing home by way of training explanation of the fact that moving railroad equipment extends beyond the rails themselves, the "stay away" warning lacks necessary comprehensive effectiveness. Rules are more likely to be observed if their rationale is understood and it is made clear that they are not just arbitrary pronouncements but are grounded in practical reasons of safety. In the present case, Kapperman may have construed the Lewis inquiry as to his being "awful close to the wires" to mean that care should be used to avoid actual physical contact. Kapperman's lips being sealed, it is, of course, speculative as to his subjective reaction to the 10 foot rule. Whether there was adequate training in view of the arcing possibility is a matter, however, which can be, but has not been, determined in the administrative proceedings.

The necessary finding of fact not having been made, we set aside the decision and order of the Commission and we remand the matter to the Commission for further proceedings consistent with this opinion. *Cf. Brennan v. OSAHRC,* 494

U.S.C. § 654(a)(1). Specific, promulgated standards preempt the general duty clause, but only with respect to hazards expressly covered by the specific standards. *See National Realty, supra,* at 1261.

F.2d 460, 464 (8th Cir. 1974); *Brennan v. OSAHRC*, 502 F.2d 946, 952–53 (3d Cir. 1974).[10]

---

**10.** The Secretary contends that Butler should at least be held responsible for a non-serious violation of 29 U.S.C. § 654(a)(2). (The Act provides for three grades of violations, depending upon the "level of gravity" of the particular violation. Those gradations are *de minimis* violations, non-serious violations, and serious violations.) The Commission majority did not rule on this point, although the concurring Commissioner did remark that he did not find a non-serious violation "in order that the case may be decided and for the reason that in the circumstances of this case the difference between no violation and a technical violation is merely a legal nicety." On remand, the Commission no doubt will consider this matter. *Cf. Brennan v. OSAHRC*, 494 F.2d 460, 463 (8th Cir. 1974) ("Thus the hearing examiner's section 17(k) rationale is irrelevant to any determination of whether or not the Secretary had established a violation, de minimis or simpliciter"); *Lee Way Motor Freight v. Secretary of Labor*, 511 F.2d 864 (10th Cir. 1975).