BAROID DIVISION OF NL INDUSTRIES, INC., Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray Marshall, Secretary of Labor, Respondent.

No. 79–1775.

United States Court of Appeals, Tenth Circuit.

Argued March 19, 1981.

Decided Sept. 21, 1981.

Stephen F. Fink, Dallas, Tex. (Stephen S. Livingston with him on the briefs) of Thompson & Knight, Dallas, Tex., for petitioner.

John R. Bradley, Atty., Washington, D. C. (Carin A. Clauss, Sol. of Labor; Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health; Allen H. Feldman, Counsel for Appellate Litigation; and John A. Bryson, U.S. Dept. of Labor, Washington, D. C., Acting Asst. Counsel for Appellate Litigation; James E. White, Regional Sol., Dallas, Tex., of counsel, with him on the brief), for respondent.

Before McWILLIAMS and McKAY, Circuit Judges, and WEST,* District Judge.

McKAY, Circuit Judge.

This is an appeal from a decision of the Occupational Safety and Review Commission which vacated the decision of an administrative law judge and affirmed the Secretary of Labor's citation of petitioner based on petitioner's violation of the general duty clause of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 654(a)(1).[1] The Secretary characterized

---

* Honorable Lee R. West, District Court Judge, of the Western District of Oklahoma, sitting by designation.

1. OSHA provides for two different sets of standards to ensure that workers are protected from the level of risk of on-the-job injury or death which existed prior to 1970 and which

Congress found in 1970 to be unacceptably high. Regulations define safety standards for particular industrial environments, and a residual "general duty clause" requires employers to abate "recognized hazards" that are likely to cause death or serious physical harm to employees at the job site. See 29 U.S.C. § 654.

the violation as serious[2] and sought to impose a penalty of $500. The Commission affirmed this assessment.

Petitioner is a materialman who leases and sells products and equipment used to drill for oil and natural gas. One of these products is drilling mud, a fluid that is poured into a drilling column to facilitate the removal of drill cuttings from the bore hole as the hole is being drilled, and to prevent natural gas from surfacing prematurely by acting as a cap on the drilling column. The viscosity of the drilling mud must be monitored and varied as the pressure of the gas in the column varies due to variations in the earth's strata. As gas becomes trapped in the drilling mud, the mud must either be discarded or circulated through a filtration system.

In addition to supplying its customers with drilling mud, petitioner furnishes them with the consultation services of "sales engineers," often referred to in the industry as "mud men." The cost of these services is included in the cost of the drilling mud. The mud man's task is to monitor a drilling operator's use of drilling mud, to advise the operator of the procedures necessary to maintain the effectiveness of the mud, and to act as an on-site sales representative for the materialman. Although the drilling operator directs the work of the mud man at the operator's rig, the materialman maintains ultimate supervisory authority over its sales mud man. Thus, the materialman has enough authority to order its mud man to leave an operator's rig where, for example, the rig has become an unsafe area. The operator, obversely, does not have authority to require a mud man to remain at the site of drilling operations. The record suggests, nonetheless, that a mud man has a strong incentive—at least in the absence of mandatory evacuation rules imposed by his employer, the materialman—not to leave the drilling site even when it becomes dangerous. His employer expects him to sell drilling mud to the operator by selling himself as an able and a cooperative mud man.

Following a sale of drilling mud in the fall of 1975, petitioner sent Larry Boden, an experienced mud man, to service the purchaser's drilling site. After reaching the site, Mr. Boden telephoned and informed petitioner that the drilling operations had encountered a pocket of pressurized natural gas, a formation referred to in the industry as a "kick." Mr. Boden also indicated to petitioner that no "gas separator" was in place to remove from the rig area accumulations of gas resulting from the kick, but that a "gas buster" was being constructed. Although the record suggests that a clear distinction between these two mechanisms is not always made in the industry, technically a gas separator is a commercially manufactured, sealed ventilation unit with long vent lines which vent gas from the drilling mud into the atmosphere generally fifty or more feet away from the drilling rig. In contrast, a gas buster, such as the one constructed on-site and later used in this case, is an unsealed ventilation unit that vents gas from the drilling mud into the atmosphere immediately above the drilling rig. The gas separator, by being sealed, allows the pressure of the gas to increase sufficiently to force the gas through the long vent lines and thus vent it at a distance. Being unsealed, the gas buster is incapable of venting the gas at a distance. In this case, the gas buster apparently worked well enough for several days during which steady winds at the rig dispersed the gas released through the gas buster. One day, however, there were no winds, and a large quantity of gas accumulated in the area of the rig. A spark ignited the gas, and the resulting explosion caused Mr. Boden to sustain serious bodily injuries.

A few days after the explosion, a compliance officer from the Occupational Safety and Health Administration inspected the

---

**2.** A violation of the Act is "serious" if the risk of serious physical harm or death is substantially probable and results from a violation that the employer knows or should know to exist. 29 U.S.C. § 666(j). Petitioner does not challenge the Secretary's finding of a "serious" violation. It contends only that it did not violate any OSHA standard. Accordingly, we do not address the § 666(j) issue.

drilling site at which the explosion had occurred. On the basis of this inspection, the Secretary issued to petitioner the following citation:

> The employer failed to provide his employees working on a rotary drilling rig a place of employment which was free from recognized hazards that could cause death or serious physical harm to an employee in that a natural gas separator and vent line were not in operation to remove natural gas a safe distance from the rig area thus creating a fire and explosion hazard.

Petitioner contested this citation on the grounds that, for purposes of OSHA, Mr. Boden was not an employee of petitioner but of the drilling operator or its subcontractor, and that petitioner had no knowledge of or responsibility for any hazardous condition that may have existed at the drilling site.

After a hearing on the matter, an administrative law judge vacated the citation. The judge first found that Mr. Boden was indeed an employee of petitioner for purposes of OSHA, because although he was under the drilling operator's supervisory control, he maintained oral and written contact with petitioner, continued to receive his wages from petitioner, and—most important—was subject to petitioner's authority to remove employees from a worksite that it did not otherwise control. The judge then ruled that petitioner had no actual knowledge of the conditions constituting the recognized hazards at the drilling site and could not have discovered them with the exercise of reasonable diligence, and therefore could not be responsible for them under the general duty clause. The judge found that to require an employer constantly to scrutinize equipment and work processes that are under another employer's complete control and that are away from the employer's premises "would be totally impracticable and an unreasonable burden." *Secretary of Labor v. Baroid Division of NL Industries, Inc.*, OSHRC No. 16096, September 20, 1976, at 14.

Upon the Secretary's appeal to the Commission, the Commission concluded that the burden the citation imposed on petitioner was not excessive but fully in accordance with OSHA. Petitioner argued that the citation against it was invalid because (1) the evidence in the record did not establish that the failure to use a gas separator is a recognized hazard, and (2) petitioner lacked authority to install a gas separator at the drilling site. The Commission rejected the first contention by concluding that, liberally and properly construed, "the citation does not allege that the failure to use a gas separator is a recognized hazard" but alleges that petitioner failed to make its employees safe from the recognized hazards of fire and explosion caused by an accumulation of gas near a drilling rig. *Secretary of Labor v. Baroid Division of NL Industries, Inc.*, OSHRC No. 16096, June 22, 1979, at 7–8. The Commission explained, "Use of a gas separator was merely one method of avoiding or minimizing the allegedly hazardous conditions." *Id.* at 7. Thus, the Commission ruled, in effect, (1) that the Secretary's citation could be sustained even if the Secretary had not established that the failure to use a gas separator is a recognized hazard, and (2) that the Secretary had shown the existence at the drilling rig of the recognized hazards of fire and explosion and accumulation of gas.

The Commission dismissed petitioner's second contention by finding that petitioner could have avoided the citation by insuring (apparently by persuasion) the installation of a gas separator *or* by ordering its employees to leave a dangerous worksite.[3] The Commission then set out four methods by which petitioner feasibly could have implemented the removal method of abatement, had it been unable or chosen not to persuade the drilling operator to install a gas separator. Petitioner could have required, either by specific instruction in each case or by an adequate work rule, that its mud man leave the site of any drilling

---

3. The Commission noted that "counsel for the Secretary clearly explained at the hearing that the type of abatement he expected of [petition-er] was elimination of the hazard if possible *or removal of employees from [the] conditions.*" *Id.* at 7 (emphasis added).

operation where (1) a kick has been encountered and (2) no gas separator is in operation to control the hazards that may arise from the kick. Petitioner, alternatively, could have given such a specific instruction or imposed such an adequate work rule where (1) a kick has been encountered, (2) a gas buster rather than a gas separator is in operation at the site, and (3) there is not enough wind to aid the gas buster in dispersing the gas. Or, petitioner could have sent a supervisor to every site that has encountered a kick to determine whether a hazard of sufficient magnitude exists at the site to trigger a specific instruction or an adequate work rule that mud men leave the site immediately. Finally, petitioner could have relied on the mud man himself to determine whether a hazard of sufficient magnitude existed at the site to trigger a specific instruction or an adequate work rule that the mud man leave the site immediately, provided that the mud man has had enough experience or training effectively to evaluate hazards of the kind at issue.

Petitioner maintains that the Commission's decision must be reversed for three reasons. Petitioner contends that the Commission's decision to uphold the citation is not supported by substantial evidence; that the Commission unlawfully based its holding on a theory of the "recognized hazard" not in issue at the administrative hearing; and that the Commission unlawfully based its holding on a theory of feasible abatement of the hazard not in issue at the administrative hearing.

### I. Substantial Evidence

■ The standards by which the validity of an OSHA citation must be judged are exacting. To support its finding that an employer has violated the general duty clause, the Secretary must show (1) that a hazard likely to cause death or serious bodily harm existed at a citable workplace; (2) that that hazard was recognized as such either by the cited employer or generally within the industry; and (3) that there was a feasible method by which the cited employer could have abated the "recognized hazard." *See, e. g., Whirlpool Corp. v.*

*OSHRC,* 645 F.2d 1096 (D.C.Cir.1981); *Titanium Metals Corp. v. Usery,* 579 F.2d 536 (9th Cir. 1978); *Empire-Detroit Steel Division v. OSHRC,* 579 F.2d 378 (6th Cir. 1978); *I. T. O. Corp. v. OSHRC,* 540 F.2d 543 (1st Cir. 1976); *National Realty & Construction Co. v. OSHRC,* 489 F.2d 1257 (D.C.Cir.1973).

### Existence of a Hazard at a Citable Workplace

The record is clear that in this case the failure of the responsible authority—whether petitioner, the drilling operator, or another—either to have a gas separator installed at the rig or to order employees to leave the worksite when it became dangerous exposed employees to safety hazards and was a causative factor of at least one employee's serious injuries. A safety hazard at the worksite is a condition that creates or contributes to an increased risk that an event causing death or serious bodily harm to employees will occur. The record reflects that a drilling operator's failure to install a gas separator where a kick has been encountered, particularly where conditions of windy weather do not help disperse gas from the rig, increases the likelihood that gas will accumulate around the rig area. The accumulation of gas, if substantial, in turn increases the risk that an explosion causing death or serious bodily harm will occur. Thus, we conclude that a substantial accumulation of gas around a rig area is a hazard. In this same sense, the record supports a conclusion that failure to use a gas separator where a kick is encountered can also be a hazard. Whether one of these hazards or the other is a hazard of sufficient magnitude to support a citation under the general duty clause must be determined with reference to whether the hazard is "recognized," an issue discussed in the next subsection.

That the hazards, whether or not they were "recognized," existed at a citable workplace is evident for two reasons. First, as the administrative law judge found, the injured employee was at all times relevant to this case an employee of petitioner. Although the employee was un-

der the drilling operator's supervisory control at the operator's workplace, he maintained oral and written contact with petitioner, continued to receive his wages from petitioner, and—most important—was subject to petitioner's authority to remove employees from a worksite that it did not otherwise control. It therefore was possible for petitioner either to use whatever bargaining leverage he possessed to persuade the drilling operator to install a gas separator, or to impose a mandatory rule with respect to such uncontrolled worksites that when specified conditions arise, the employee must leave the worksite. These findings by the judge were implicitly adopted by the Commission. Since substantial evidence in the record supports them, we are required by 29 U.S.C. § 660(a) to consider them conclusive. Accordingly, we conclude that the hazards existed at a citable workplace.

Second, the courts in other cases have upheld OSHA citations of an employer based upon the exposure of its employee to hazards existing at worksites not controlled by that employer. In *Brennan v. Butler Lime and Cement Co.,* 520 F.2d 1011 (7th Cir. 1975), the employee of a materialman was killed after being exposed to a recognized hazard existing at a worksite controlled by the purchaser of the materialman's goods. The employee in *Butler Lime* had delivered a load of bagged cement and lime to the purchaser's construction site. While unloading the pallets of these materials with the mobile crane boom with which his truck was equipped, the employee swung the boom too close to a series of 4800-volt overhead electric power lines. The crane boom either touched the power lines or went near enough to them that a bolt of electricity arced from the wires to the boom. The employee was electrocuted. Although the materialman had warned its employee "not to get too close" to 'high power lines in unloading its delivery trucks, it did not warn the employee that electricity can arc. *Id.* at 1015. Beyond these instructions, it was the materialman's policy "that a driver should use his own judgment where to place the material delivered." *Id.*

at 1013. On the basis of these facts, the materialman "contended that it had adequately trained and instructed [its employee] in the safe operation of the crane." *Id.* at 1014.

The Seventh Circuit upheld the Secretary's citation of the materialman, stating that

if an employee is negligent or creates a violation of a safety standard, that does not necessarily prevent the employer from being held responsible for the violation. ... A particular instance "of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous nature, at the moment of its occurrence, ... [where] such conduct *might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees."*

*Id.* at 1017 (quoting *National Realty and Construction Co., Inc. v. OSHRC,* 489 F.2d 1257, 1266–67 n.37 (D.C.Cir.1973) and adding emphasis). Remanding the case to the Commission for further findings of fact, the court held that whether the employer was liable for a serious violation of OSHA depended on whether the employee had received adequate training and safety instructions in view of the arcing hazard.

The off-site event resulting in the employee's death in *Butler Lime* is analogous to the event resulting in the employee's serious bodily injury in the case before us. As in *Butler Lime,* the employee here was struck down by the actuality of a hazard at a worksite not controlled by his employer; the employee had little more training than general admonitions to be careful and to use his own judgment as to safety precautions; and the employer might have avoided the harm by adequately training its employee to avoid the hazard—in *Butler Lime* to keep clear of the arc from high power lines, here to keep clear of drilling sites at which hazardous quantities of gas have accumulated. We find *Butler Lime* persuasive in its ruling that the existence of a recognized hazard at a worksite not controlled by a materialman may sub-

ject that materialman to OSHA liability where its employee feasibly could have been but was not trained to successfully avoid the hazard. In *Beatty Equipment Leasing v. Secretary of Labor*, 577 F.2d 534 (9th Cir. 1978), the Ninth Circuit held that a materialman for a multi-employer construction site violates OSHA where its affirmative act creates a feasibly avoidable recognized hazard. We hold that a substantial and serious act of omission by an off-site materialman, like that in *Butler Lime* or that alleged in this case, may violate OSHA just as surely as the act of commission by the off-site materialman in *Beatty*.

### Existence of a Recognized Hazard

■ Whether a condition at the worksite constitutes a "recognized hazard" is a question of fact as to which the findings of the Commission that are supported by substantial evidence on the record are conclusive. *See* 29 U.S.C. § 660(a). The Commission's first two alternative bases for upholding the Secretary's citation were that petitioner feasibly could have avoided the citation by insuring that a gas separator is used at any drilling site at which a kick has been encountered, or by requiring mud men to remove themselves from any such drilling site where no gas separator is in operation. It is true, as the Commission points out in its opinion, that petitioner could have avoided citation by relying upon one of these methods to abate the hazards of fire and explosion and gas accumulation. Neither of these methods of abatement, however, can be required of petitioner unless the absence of a gas separator itself is a recognized hazard. Here, the Commission found that such a condition is not a recognized hazard. The Commission interpreted the citation in light of the administrative record as a whole as not even alleging that the failure to use a gas separator is a recognized hazard. Moreover, the Commission implicitly acknowledged that the absence of a gas separator is not recognized in the industry as constituting a hazard per se:

> Separators are used on less than five percent of all wells, and only after casing has been inserted in a well in anticipation

of hitting a large quantity of gas. Busters are used more extensively than separators, primarily because busters are less expensive and can be constructed quickly to meet emergency situations.

*Baroid*, June 22, 1979, at 5. Finally, the Commission concluded that the hazards alleged and proved to be "recognized hazards" in this case were the hazards of gas accumulation, fire, and explosion. We have reviewed the record and conclude that substantial evidence supports these findings but not the broader hypothesis that the absence of a gas separator is a recognized hazard. Since the absence of a gas separator itself was not a recognized hazard, the Commission's first two alternative bases for upholding the citation—that petitioner could have either insured that a gas separator was used or removed its mud men from any drilling site lacking a gas separator—cannot sustain the validity of the citation.

■ In contrast, the Commission's final three alternative bases for upholding the citation—that the employer (1) feasibly could require a mud man to remove himself from a drilling site where a kick has been encountered, only a gas buster is in operation, and there are no winds; (2) feasibly could send a supervisor to monitor gas accumulation at a drilling site and could impose mandatory evacuation rules; and (3) feasibly could train the mud man to monitor gas accumulations and could impose mandatory evacuation rules—meet the second prong of the general-duty-clause test. These methods of abatement all require a finding that the hazards of gas accumulation, fire, and explosion be recognized as such either by the cited employer or generally within the industry. The Commission so found: "The petroleum industry generally, and [petitioner] specifically, recognize that the accumulation of natural gas near a drilling rig creates fire and explosion hazards." *Baroid*, June 22, 1979, at 8. Substantial evidence on the record supports these findings, and they therefore are conclusive.

### A Feasible Method of Abatement

■ OSHA does not impose on employers an absolute duty to make safe the working

environment of its employees. *Getty Oil Co. v. OSHRC*, 530 F.2d 1143, 1145 (5th Cir. 1976). But it does require the employer to abate recognized hazards as to which the Secretary has met his burden to show that a feasible method exists by which the cited employer could have abated the hazard. The Supreme Court recently has made clear that "feasible" for purposes of OSHA means economically and technologically capable of being done. *American Textile Manufacturers Institute, Inc. v. Donovan*, —— U.S. ——, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981).

■ The Commission found that the Secretary had sustained his burden of proving the recognized hazard to be feasibly abatable. The record, however, is devoid of substantial evidence that the Commission's third proposed method of abatement—requiring employees to evacuate a site encountering a kick where only a gas buster is in operation and where there are no winds—is feasible. It is far from clear on this record that in every instance in which these factors are present the recognized hazards are also present. For example, where the emergent gases are significantly warmer or lighter than the air around the rig, they would rise rapidly and could thereby be vented adequately. In any event, this record does not establish that whenever these factors are present there is a hazardous accumulation of gas. Therefore, we find that this method, like the first two proposed methods, is merely a prophylactic measure, one by which petitioner could more than satisfy its duty but which does not, standing alone, support the citation.

Similarly, we are unable to locate substantial evidence on the record to show the feasibility of the Commission's fourth method of abatement—the monitoring by a supervisor of the mud men of gas accumulations at every drilling operation that has encountered a kick but has no gas separator in place, coupled with a mandatory evacuation requirement. With respect to this fourth method, the record reflects that every mud man works at several drilling sites in a given period of time and that petitioner

employs numerous mud men. The record thus suggests that the fourth method is not economically capable of being done. In any event, the Secretary has offered no evidence to show the feasibility of this kind of close and direct supervision.

■ There is some evidence on the record to support the Commission's suggestion that the fifth method of abatement—the monitoring of gas accumulations by adequately trained mud men themselves, coupled with a mandatory evacuation requirement—is feasible. Evidence in the record suggests that petitioner could have instructed its employees to evacuate a worksite when they smell accumulations of gas. Kenneth Ray Smith, a district manager of petitioner, who was the injured employee's supervisor at the time the explosion occurred, testified at the administrative hearing as follows:

Q. One question. Can you tell when you're in the area whether or not there is a significant amount of the vapors in the area or gasses?

A. You can smell it.

Q. It does smell? Can you tell whether or not it's going to be hazardous by smell?

A. No, sir.

Q. How would you be able to tell whether it's going to be hazardous or explosive?

A. I would always assume that if I could smell it that it could be explosive.

Record, vol. 2, at 139–40. The injured employee himself testified that he smelled an accumulation of gas just before the explosion occurred, but that he did not know of any way to measure "how much the air can stand before it will ignite." *Id.* at 168.

We intimate no opinion as to whether this evidence, if unrebutted, would constitute substantial evidence to sustain the Commission's implicit finding that the Secretary had met his burden of showing that training employees to detect hazardous levels of gas accumulations by sense of smell is technologically feasible. On this record, we cannot tell whether the lack of evidence on this issue is due simply to the parties' fail-

ure to present such evidence or to inadequate notice that defective safety training as to gas detection was the alleged basis for liability in this case. This basis of liability was not mentioned in the citation, and there is a substantial likelihood that this defect in notice was not adequately cured at the hearing. In *Whirlpool Corp. v. OSHRC*, 645 F.2d 1096 (D.C.Cir.1981), the court remanded the case for further development of the record because it could not discern whether the lack of evidence reflected an unmeritorious charge or lack of adequate notice of the alleged basis for liability. We find ourselves in precisely the same position. We therefore remand this case for further development of the record through a hearing on the issue whether training employees to measure hazardous levels of gas accumulation by sense of smell is feasible. If the evidence shows that detection by employees of hazardous levels of gas accumulation by sense of smell is feasible, and if training employees to so detect the gas accumulations is feasible, then the citation will stand. If, on the other hand, the evidence does not show that training to detect hazardous levels of gas accumulation by sense of smell is feasible, the citation must fall. Both parties will be permitted on remand to supplement the record through the presentation of evidence. The Secretary, however, will be limited to presenting evidence on the issue of training employees to detect gas accumulations by sense of smell, and may not present evidence on training in other detection methods such as the use of electronic monitors. Detection by sense of smell was the only feasible method of abatement the Secretary attempted to show on this fifth theory of liability, and the remand is not to provide an opportunity for the Secretary to get a second bite at the apple by attempting to show a feasible method of abatement he did not attempt to show at the first hearing.

## II. Notice of the Theories of the "Recognized Hazard" and a Feasible Method of Abatement

Petitioner contends that the Commission unlawfully based its holding on a theory of the recognized hazard and a theory of feasible abatement not in issue at the administrative hearing. 29 U.S.C. § 658(a) provides that an employer charged with a violation of the general duty clause must be given adequate notice in the citation: "Each citation shall be in writing and shall describe with particularity the nature of the violation . . . ." Interpreting this provision, the D.C. Circuit has concluded, "Ideally, the citation should provide the employer with notice of the Secretary's contentions pertinent to each of the three elements underlying a general duty violation." *Whirlpool Corp. v. OSHRC*, 645 F.2d 1096, 1098–99 (D.C.Cir.1981).

Although we agree that this interpretation states the ideal, it does not state the due process minimum. The D.C. Circuit itself has acknowledged "the familiar rule that administrative pleadings are very liberally construed." *National Realty and Construction Co. Inc. v. OSHRC*, 489 F.2d 1257, 1264 (D.C.Cir.1973). As Professor Davis has stated, "The most important fact about pleadings in the administrative process is their unimportance." 3 K. Davis, Administrative Law Treatise § 14:11 at 46 (2d ed. 1980). An OSHA citation must give reasonably particular notice so that the cited employer will understand the charge being made and will have a full and fair opportunity to prepare and present a defense. "Citations, however, are prepared by inspectors who are not legally trained and who should act with dispatch. For these reasons, citations should not be as tightly construed as other pleadings—a grand jury indictment, for example." *Babcock & Wilcox Co. v. OSHRC*, 622 F.2d 1160, 1164 (3d Cir. 1980). "Enforcement of the Act would be crippled if the Secretary were inflexibly held to a narrow construction of citations issued by his inspectors." *National Realty*, 489 F.2d at 1264. The reviewing court's decision with respect to a citation of marginal particularity must encourage inspectors to issue citations with precision but must also implement Congress' clear intent that OSHA be enforceable.

■ Where notice of the violation charged is not set forth with sufficient particularity in the citation to satisfy due process, however, the reviewing court must determine whether any substantial ambiguities in the Secretary's notice were resolved at the hearing itself. "So long as fair notice is afforded, an issue litigated at an administrative hearing may be decided by the hearing agency even though the formal pleadings did not squarely raise the issue." *National Realty*, 489 F.2d at 1264; *see Whirlpool Corp.*, 645 F.2d at 1099; *accord, Babcock*, 622 F.2d at 1164 (the offense as tried permissibly involved an additional consideration not expressed in the citation).

As a statement of the Secretary's theory of what constituted the "recognized hazard," the citation is not a model of clarity. It can reasonably be construed to state that the failure to use a gas separator is a recognized hazard, a finding not supported by substantial evidence on this record. The Commission, however, construed the citation to state that "[u]se of a gas separator was merely one method of avoiding or minimizing the allegedly hazardous conditions," and that "the alleged hazards are fire and explosion, both of which were created by the accumulation of gas near the drilling rig." *Baroid*, June 22, 1979, at 7. Although we acknowledge that the citation is somewhat ambiguous, we conclude that the Commission's reading is reasonable since the citation explicitly identifies the risks of fire and explosion as "hazards."

Petitioner contends that the Commission's interpretation is illogical in that it finds the recognized hazard to be the *occurrence* of fire and explosion and therefore petitioner's violation to be that it permitted its employee "to work inside a fire and during an explosion which Baroid should have known was underway." Petitioner's Brief at 20–21. In our view, however, the Commission identified as the recognized hazard not solely the actuality but also the increased risk or likelihood of fire or explo-

sion as "created by the accumulation of gas near the drilling rig." By finding the recognized hazard to be the "hazards [of] fire and explosion . . . created by the accumulation of gas," it identified the risks of accumulated gas, of fire, and of explosion to be the recognized hazards.

■ Even assuming that the OSHA citation in this case is ambiguous, we must reject petitioner's change-of-theory contention because any ambiguity was cleared up at the hearing. It is true that the citation, the complaint, and the issues actually tried at the administrative hearing suggest that the Secretary hoped to show that the absence of a gas separator was a recognized hazard. The record also shows, however, that if that was in fact a theory in the case, an alternative theory of the recognized hazard was tried at the hearing. The administrative law judge asked the Secretary to state his theory of the recognized hazard. The Secretary responded that the "real hazard" arose from "[t]he venting portion of the separator and vent line" because, "[i]t wasn't venting a safe distance away." Record, vol. 2, at 153. The Secretary's emphasis plainly was on the lack of effective venting, rather than on the lack of a particular kind of vent. Thus, while the Secretary did not baldly state that the recognized hazard was the accumulation of gas, his restatement of his theory at the hearing cannot mean anything else. That petitioner was aware that this theory of the recognized hazard was an issue in the case is apparent from questions it posed later at the hearing.[4] We conclude, therefore, that petitioner received adequate notice of the Secretary's theory of the recognized hazard. Accordingly, we cannot say that the Commission's findings were based on a belated and thus an unlawful change in that theory, or that petitioner was prejudiced by the Commission's definition of the theory.

■ We are more persuaded by petitioner's contention that the method of abatement based on adequate training was not in

---

4. For example, petitioner initiated the following colloquy:

    Q. Is it generally self-acknowledged in the oil industry that if there's gas in the air that

any spark . . . could possibly cause a dangerous condition?

    A. Yes, sir.

Record, vol. 2, at 292.

issue at the hearing. The citation, of course, said nothing remotely related to training. Furthermore, based upon the record we cannot say whether the hearing gave petitioner full and fair notice that the feasible method of abatement at issue was training employees to monitor gas accumulations through sense of smell and imposing a rule to leave the worksite when the level of gas accumulation became hazardous. It is true that the following colloquy took place:

> Judge Cronin: Now, what precautionary steps does the Secretary contend should have been taken by [petitioner] in this case regarding the presence of this recognized hazard, alleged recognized hazard?

> Secretary: If anything could be done by [petitioner] to eliminate the hazard, this should be done, however if they were unable to do that they should have instructed their employees to leave the hazardous location or made it clear that he should be leaving if it's a hazardous location.

Record, vol. 2, at 154. It is also true that both parties questioned witnesses about employee training. These questions, however, did not mention smell-detection of gas accumulations by employees, and thus perhaps did not give notice to petitioner that its liability could be based on failure to train employees on this subject. The very few questions regarding detection of gas through sense of smell were not explicitly related to training. While an inadequate citation may be cured through actual notice at the hearing, the employer must at least at the hearing stage receive adequate notice of what particular steps it should have taken to avoid citation. *See Bristol Steel & Iron Works, Inc. v. OSHRC*, 601 F.2d 717, 724 (4th Cir. 1979); *National Realty*, 489 F.2d at 1268.

We held in Part I that the only permissible theory of liability validating the citation is the failure to adequately train employees to detect hazardous accumulations of gas. Since we cannot tell on this record whether petitioner received adequate notice of this issue, we feel it necessary to remand this case for a hearing on the issue whether training employees to detect hazardous levels of gas accumulations through sense of smell is a feasible method of abatement.

Accordingly, the order of the OSHRC is vacated and the record remanded for further development on this issue.

So ordered.