# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| WESTERN OILFIELDS SUPPLY, d/b/a RAIN FOR RENT, | ) ) ) | No. 75615-0-I |
| Appellant, | ) ) | |
| v. | ) ) ) | |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | ) ) ) | UNPUBLISHED OPINION |
| | ) | FILED: November 20, 2017 |
| Respondent. | ) ) ) | |

VERELLEN, C.J. — A Rain for Rent employee suffered a severe hand injury when he reached inside a rented pipe fusion machine without deactivating the machine's hydraulics. The Department of Labor and Industries (Department) cited Rain for Rent for violating WAC 296-155-040(2), the safe place standard.

The manufacturer's operator manual instructs users to turn off the hydraulics before reaching inside the unit. Rain for Rent did not provide the operator's manual with the machine or require the employee to review the manual, and Rain for Rent itself identified the employee's failure to follow the operator's manual as a cause of the incident. Because the Department presented substantial evidence that Rain for Rent failed to provide a workplace free of a hazard, the hazard was recognized, the hazard caused serious physical harm, and there were feasible means to eliminate or

materially reduce the hazard, the Board of Industrial Insurance Appeals (Board) did not err when it upheld the citation.

Additionally, the Board correctly determined Rain for Rent did not prove its affirmative defense of unpreventable employee misconduct. And Rain for Rent failed to establish the accident prevention program rule was more specific than the safe place standard in this setting.

Therefore, we affirm.

## FACTS

Rain for Rent is a nationwide company that provides temporary liquid handling solutions. In July 2013, Rain for Rent was helping build a wastewater treatment plant in Bellingham. Rain for Rent rented a McElroy Pitbull-900 pipe fusion machine to assist with the project.

Michael Landdeck, who primarily worked for Rain for Rent as a delivery driver, was assigned the job of operating the fusion machine. He performed fusion jobs once every year or year and a half. Landdeck had received prior training on using pipe fusion machines, but Rain for Rent had not performed a fusion job in nearly two years. The Pitbull-900 was a new machine that Rain for Rent had not used before.

Landdeck discovered that the operator's manual was not with the machine "the day the machine showed up"[1] Landdeck informed his supervisor that the operator's manual was missing from the machine's manual box. Rain for Rent

---

[1] Clerk's Papers (CP) at 264-65.

neither provided a copy nor required Landdeck to review the manual. Landdeck continued to use the fusion machine without reviewing the manual.

The fusion machine's carriage had two fixed jaws and two hydraulically operated jaws. These jaws held the two pipe sections in place. A double-sided "facer" (circular pipe with three rotating cutter blades) was between the jaws. To "face"[2] the pipe, Landdeck used the machine's hydraulics to move the jaws together, bringing the two pipe ends into contact with the facer. The rotating cutter blades shaved plastic ribbons[3] from the pipe, squaring off the ends of the pipe. A heat plate then seals the pipe ends together. Unlike the machines Rain for Rent had used before, this machine had different hydraulic controls, and the heat plate stayed on even when the hydraulics were shut off.

The operator's manual for the Pitbull-900 instructed, "Turn the hydraulics off if it is necessary to enter the unit for maintenance or chip removal. Death or serious injury will result if the hydraulics are activated while in the unit."[4] The warnings referred to cleaning "shavings out of pipe ends *and from between the jaws.*"[5] And the manual directed, "Before operating this machine, please read this manual thoroughly,

---

[2] "Facing" is the process of shaving down the pipe ends to prepare for fusing them together. See CP at 255, 575-80.

[3] At the hearing, Landdeck called the plastic shavings "ribbons," see CP at 255, but the operator's manual refers to them as "shavings" or "chips," see CP at 576. These terms were used interchangeably at the hearing, see CP at 307 ("Okay. What did the operator's manual say about chip or ribbon removal during pipe facing?").

[4] CP at 576.

[5] CP at 576 (emphasis added).

and keep a copy with the machine for future reference. *This manual is to be considered part of your machine.*[6]

On July 16, 2013, Landdeck used this machine to face two sections of 36-inch high density polyethylene (HDPE) pipe. He noticed plastic shavings catching between the facer and a metal shroud that covered it. He thought he had to remove the shavings to continue the job, so he reached into the machine to dislodge them. Landdeck did not deactivate the machine's hydraulics before attempting to remove the shavings. He inadvertently leaned against a lever near his knee, which moved the carriage to the right, pinching his hand between the pipe and the facing plate. The force crushed his hand.

In the weeks before the incident, Landdeck had completed several job safety analysis (JSA) worksheets that identified "pinch points" as a hazard and directed the operator of the machine to watch hand placement. In the handwritten section of the JSA worksheet, Landdeck wrote, "Keep hands out of pinch points."[7] But the JSA worksheets did not provide instructions on how to remove shavings and did not mention turning off the hydraulics.

Rain for Rent's employees participate in an initial 40-hour training, monthly specific safety and health training, and an annual lockout/tagout program. The company also has written safety rules, policies, and procedures available in hard copy at each branch. The goal of the written lockout/tagout policy is "that adequate

---

[6] CP at 545 (emphasis added).

[7] CP at 279.

4

procedures exist to prevent unexpected energization, start up or release of stored energy."[8] After the incident, Landdeck told the Department's compliance officer he had not seen the lockout/tagout policy or Rain for Rent's pipe cleaning standard operating procedure. At the hearing, Landdeck testified he was aware of the lockout/tagout policy and it was possible he reviewed it before the incident, but the policy did not specifically address this machine. Landdeck testified that he had never been trained on the issue of ribbons being stuck while facing pipe. At the hearing, Landdeck also testified it was "possible" Rain for Rent had a policy to shut down hydraulics. Landdeck had not previously encountered this problem with shavings. At some unspecified time, Landdeck participated in two two-week training sessions with the manufacturer's representative. There is no evidence of the substance of the manufacturer's training. Rain for Rent's regional safety manager testified that he had the same five days of training on fusion provided by Rain for Rent fusion instructors and that training included turning off hydraulics before reaching into a fusion machine.

For the fusion machines Landdeck previously used, turning off the hydraulics also shut off the heater plate. After discussing the incident with Landdeck, the inspector believed Landdeck did not turn off hydraulic pumps because he thought he would have to wait for the heater plate to reheat, and Landdeck was concerned about the July 19, 2013, project deadline.

---

[8] CP at 448.

Rain for Rent conducted an internal investigation. Its regional safety manager concluded the incident was caused by (i) Landdeck's failure to follow the operator's manual while using the fusion machine, (ii) Landdeck's failure to follow Rain for Rent's lockout/tagout policy, (iii) Landdeck's failure to follow Rain for Rent's HDPE pipe cleaning standard operating procedure, (iv) the speed of the fusion process to meet the July 19 deadline, and (v) worker fatigue. The report noted Landdeck did not shut down the hydraulic pump before "entering the pinch crush point."[9]

Landdeck received "written disciplinary action" as a result of this incident.[10] According to Landdeck's site supervisor, having an operator's manual would probably have helped with the heater plate shutdown because the manual would have explained the heater plate would not lose heat even if the operator shut down the hydraulics.

The Department cited[11] Rain for Rent for violating WAC 296-155-040(2), the safe place standard.[12] Rain for Rent appealed to the Board, and the Board affirmed the citation. The Board noted, "The employer could have insisted its fusion machine operators thoroughly read the operator's manual in order to be prepared for

---

[9] CP at 479.

[10] CP at 466.

[11] On September 24, 2013, the Department cited Rain for Rent for violating WAC 296-155-035(2) (inadequate training), but issued a corrective notice on December 16 citing Rain for Rent for violating WAC 296-155-040(2) (safe place standard) instead.

[12] "The employer did not adopt and use practices or methods which are reasonably adequate to furnish a place of employment that is free from a recognized hazard." CP at 533.

situations (like this one) which may not have been seen before by any particular machine operator."[13]

The Board found Landdeck "was exposed to the potential and foreseeable hazard of an unsafe workplace when his hands were in close proximity of the fusion machine while he was operating the machine."[14] And Rain for Rent failed to provide a safe workplace because it failed to (i) furnish a copy of the manual to its employee, (ii) insist its employee read the manual, or (iii) provide equivalent training. It also found Rain for Rent "did not take effective steps to discover and correct violations of safety rules related to the protection of its workers from potential injuries."[15] It concluded the Department "met each element of the safe place standard, WAC 296-155-040(2), by a preponderance of the evidence."[16]

On appeal, the Whatcom County Superior Court affirmed the Board's decision, concluding that substantial evidence supported the Board's decision.

Rain for Rent appeals.

ANALYSIS

We review the Board's decision directly, based on the record before the agency.[17] The Board's findings of fact "are conclusive if supported by substantial

---

[13] CP at 57.

[14] CP at 59.

[15] CP at 60.

[16] CP at 57.

[17] J.E. Dunn Nw., Inc. v. Washington State Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007).

evidence when viewed in light of the record as a whole."[18] Evidence is substantial if it is sufficient to "persuade a fair-minded person of the truth of the declared premise."[19] This court views "the evidence and reasonable inferences in the light most favorable to the prevailing party."[20] If there is substantial evidence to support the findings, we determine whether the findings support the conclusions of law.[21]

*I. WAC 296-155-040(2) "Safe Place Standard" Violation*

Rain for Rent contends the citation should be vacated because the Department failed to establish that Rain for Rent violated WAC 296-155-040(2), the safe place standard.

The regulation requires an employer to "furnish each employee a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to employees."[22] The regulation also requires employers to "adopt and use practices, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe."[23]

To establish a violation of a safety regulation under the Washington Industrial Safety and Health Act (WISHA), chapter 49.17 RCW, the Department must prove (i) the employer failed to provide a workplace free of a hazard, (ii) the hazard was

---

[18] Id. at 43 (citing RCW 49.17.150(1); RCW 34.05.570(3)(e)).

[19] Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

[20] Frank Coluccio Const. Co. v. Washington Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

[21] Id. (citing RCW 49.17.150(1)).

[22] WAC 296-155-040(1).

[23] WAC 296-155-040(2).

recognized, (iii) the hazard was likely to cause death or serious injury, and (iv) there were feasible means to eliminate or materially reduce the hazard.[24] [25]

*(i) Workplace Free of Hazard*

Rain for Rent argues the Department did not present substantial evidence that a hazard existed at the worksite.

Here, Landdeck was exposed to "the potential and foreseeable hazard of an unsafe workplace when his hands were in close proximity of the fusion machine while he was operating the machine."[26] Specifically, he was injured when he attempted to remove shavings from inside the fusion machine. Substantial evidence supports the Board's finding that this was an unsafe work practice. Landdeck testified he did not deactivate the machine's hydraulics before attempting to remove the shavings. When Landdeck's leg inadvertently pressed against a lever that controlled the machine's hydraulic jaws, his hand was crushed. The Department's construction

---

[24] Dep't of Labor & Indus. v. Kaiser Aluminum & Chem. Corp., 111 Wn. App. 771, 780, 48 P.3d 324 (2002) (citing Donovan v. Royal Logging Co., 645 F.2d 822, 829 (9th Cir. 1981)); SeaWorld of Florida, LLC v. Perez, 748 F.3d 1202, 1207 (D.C. Cir. 2014).

[25] When construing WISHA statutes, Washington courts look to parallel federal authority under the federal Occupational Safety and Health Act (OSH Act), 29 U.S.C. §§ 651-678. See SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 433, 144 P.3d 1160 (2006) ("As part of its burden under the general duty clause, L & I 'must specify the particular steps the employer should have taken to avoid the citation . . . [and] must demonstrate the feasibility and likely utility of those measures.' This is the same burden that OSH Act's general duty clause requires.") (quoting Kaiser Aluminum, 111 Wn. App. at 780).

[26] CP at 59.

construction safety expert, David Conley, testified that this exposed Landdeck to a "caught-in or struck-by hazard."[27]

Rain for Rent offers Department of Labor & Industries v. Kaiser Aluminum & Chemical Corporation for the proposition that its "adequate safety and training program" negated any actual hazard at the worksite.[28] But Kaiser Aluminum stands only for the proposition that the practice of using an angle iron to support the bucket of a small front-end loader was widely accepted in the industry, and the Department failed to present evidence that the angle iron had failed or became dislodged to cause the injury.[29] It does not stand for Rain for Rent's suggestion that training renders a hazard moot. Viewed in a light most favorable to the prevailing party, the record supports the determination that a hazard existed.

*(ii) Recognized Hazard*

Rain for Rent contends the Department did not present substantial evidence that the hazard was "recognized."[30]

A hazard is "recognized" if the employer had actual knowledge that the condition was hazardous or it is generally known to be hazardous in the industry.[31] Recognition may be proved without reference to industry practice or safety expert

---

[27] CP at 377.

[28] 111 Wn. App. 771, 48 P.3d 324 (2002).

[29] Id. at 773, 780.

[30] Br. of App. at 16.

[31] Kelly Springfield Tire Co. v. Donovan, 729 F.2d 317, 321 (5th Cir. 1984); see Titanium Metals Corp. of America v. Usery, 579 F.2d 536, 541 (9th Cir. 1978) ("An activity or practice may be a 'recognized hazard' even if the employer is ignorant of the existence of the activity or practice or its potential for harm.")

testimony if the hazard is "obvious and glaring."[32] An employer's knowledge can be actual or constructive, and common knowledge can be used to establish that a hazard is recognized.[33]

Rain for Rent narrowly defines the hazard as removing chips stuck under the shroud and argues this particular hazard was not recognized by the company or the industry at large. But the hazard was reaching between the jaws to remove chips, a risk expressly recognized in the operator's manual. And reaching between the jaws of an energized pipe fusion machine is also an "obvious and glaring" hazard.[34] As the Department's construction safety expert testified, "*common sense* just tells me, from looking at the machine and how it operates, that there are many hazards."[35]

*(iii) Caused Serious Physical Harm*

It is undisputed that the Pitbull-900 fusion machine was "likely to cause death or serious injury."[36]

---

[32] Tri-State Roofing & Sheet Metal, Inc. v. Occupational Safety & Health Comm'n, 685 F.2d 878, 880-81 (4th Cir. 1982).

[33] See In Re: The Hertz Corp., 1996 WL 473419, at *4 (Wash. Bd. Ind. Ins. App.) (holding crossing the middle line in a road and driving the wrong way into traffic constituted a recognized hazard).

[34] See Tri-State Roofing, 685 F.2d at 880-81 ("Where a hazard is obvious and glaring, the [Occupational Safety and Health] Commission may determine that the hazard is recognized for purposes of the general duty clause, 29 U.S.C. s 654(a)(1), without reference to industry practice or safety expert testimony.").

[35] CP at 378 (emphasis added); see CP at 328 (regarding how he determined this was a recognized hazard even though it may have been an isolated incident, the Department's compliance officer testified on cross-examination, "It's a pinch point on a machine that you had access to because it's right in front of your face when you're operating the machine.").

[36] Kaiser Aluminum, 111 Wn. App. at 780.

*(iv) Feasible Means to Correct or Materially Reduce the Hazard*

Rain for Rent contends the Department failed to show that a feasible abatement method existed to mitigate the hazard.

Employers do not have an absolute duty to make safe the working environment of its employees.[37] But employers do have the duty to abate recognized hazards.[38] An effective abatement method is one that will materially reduce or eliminate the hazard and is a feasible and useful means of doing so.[39] "Abatement is 'feasible' when it is 'economically and technologically capable of being done.'"[40]

Here, the Board noted several feasible means to reduce the hazard, including (i) attaching a safety manual to the machine, (ii) insisting its fusion machine operators thoroughly read the operator's manual, or (iii) providing training or instruction on how to remove shavings from a pipe fusion machine.

Rain for Rent argues the Board's ruling creates an unreasonable per se rule that employers must "attach operator's manuals to every piece of machinery."[41] To the contrary, attaching the manual to the machine was only *one* of three ways the Board suggested Rain for Rent could have abated the hazard.

---

[37] Baroid Div. of NL Indus., Inc. v. Occupational Safety and Health Review Comm'n, 660 F.2d 439, 447-48 (10th Cir. 1981).

[38] Id.

[39] Sec'y of Labor v. Morrison-Knudsen Co., 16 O.S.H. Cas. (BNA) 1105, 1993 WL 127964, *19 (O.S.H.R.C. Apr. 20, 1993).

[40] SeaWorld of Florida, 748 F.3d at 1215 (quoting Baroid, 660 F.2d at 447).

[41] Br. of App. at 25.

Rain for Rent contends having the manual with the machine would not have made a difference because the warning is for maintenance or chip removal only "in the context of cleaning shavings 'out of pipe ends.'"[42] But the manual refers to removing "shavings out of pipe ends *and from between the jaws.*"[43] Landdeck was removing plastic shavings from "between the jaws" at the time of the incident. Substantial evidence taken in the light most favorable to the Department supports the determination that the manual's warnings applied in this setting. Rain for Rent's own investigation also identified Landdeck's failure to follow the manual's directions as a cause of the incident.

The Board recognized there was evidence that Landdeck may not have turned off the hydraulics for fear that the heater plate would have to be reheated and the delay would have jeopardized his deadline. Rain for Rent suggests reading the manual would have been ineffective because the manual did not state the hydraulic pump and heater plate were separately controlled. But the manual shows the hydraulic pump and the heater are controlled by separate on/off switches. The depiction of the separate switches in the manual supports a reasonable inference that the hydraulics could be shut off independently of the heater plate.

Rain for Rent contends Landdeck was trained and aware of the pinch point potential of the fusion machine. The JSAs acknowledged that pinch points were hazards, but contrary to Rain for Rent's contention advanced at oral argument, the

---

[42] Br. of App. at 17.

[43] CP at 576 (emphasis added).

13

JSA's did not address what steps employees should take if they encounter shavings getting caught in the machine. And the compliance officer noted during his investigation Landdeck had no formal training in this model of fuser, there was no formal company policy for shavings removal using this size pipe, and Landdeck "was not aware that the hydraulics could be shut off independent of the heating pad because it was a newer model of machine that he hadn't worked with before on the fusion."[44]

Taking the evidence and reasonable inferences in the light most favorable to the Department, (i) providing the operator's manual, (ii) insisting the employee read the manual, and (iii) specific training on chip removal were each feasible means to mitigate the hazard.

We conclude the Board properly affirmed the safe place standard violation.

*II. Unpreventable Employee Misconduct*

Rain for Rent argues the citation should be vacated because it resulted from unpreventable employee misconduct.

The Department may not issue a citation if unpreventable employee misconduct caused the violation.[45] To establish this affirmative defense,[46] the employer must show:

---

[44] CP at 322.

[45] RCW 49.17.120(5)(a).

[46] Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 435, 377 P.3d 251 (2016), review denied, 186 Wn.2d 1024 (2016).

(i) A thorough safety program, including work rules, training, and equipment designed to prevent the violation;

(ii) Adequate communication of these rules to employees;

(iii) Steps to discover and correct violations of its safety rules; and

(iv) Effective enforcement of its safety program as written in practice and not just in theory.[47]

"An employer asserting the defense must prove each element."[48] The "'evidence must support the employer's assertion that the employees' misconduct was an isolated occurrence and was not foreseeable.'"[49] We apply the substantial evidence standard to our review of Rain for Rent's proof of its unpreventable employee misconduct defense.[50]

First, Rain for Rent contends its safety program was thorough because it included a lockout/tagout policy that "instructed employees on how to isolate hazardous energy" and Landdeck participated in training from the machine's manufacturer.[51] But there is a factual dispute as to when Landdeck reviewed the lockout/tagout policy, and there is no evidence the lockout/tagout policy addressed the safe removal of shavings from the fusion machine. Additionally, Rain for Rent did

---

[47] RCW 49.17.120(5)(a).

[48] Potelco, Inc., 194 Wn. App. at 435.

[49] Id. (quoting BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 111, 161 P.3d 387 (2007)).

[50] Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 363, 119 P.3d 366 (2005).

[51] Br. of App. at 28.

15

not establish when the manufacturer's training occurred, and there is no evidence of the substance of Landdeck's specific training with the manufacturer.

Here, the Board noted Rain for Rent "offered records of various safety meetings that purport to reflect a safety program that includes regular safety meetings, training, and communication of the safety program to employees."[52] The regional safety manager testified that Rain for Rent has eight chapters of policies, procedures, and written safety rules, with approximately between fifteen and twenty different safety rules in each chapter. The Rain for Rent fusion instructors teach operators to turn off hydraulics before reaching into a machine. But the absence of training on safe removal of shavings from between the jaws, without providing the required operator's manual or requiring Landdeck to review the manual, leaves doubts about the thoroughness of Rain for Rent's safety program.

Second, Rain for Rent contends it adequately communicated its safety rules to employees. But the Board observed, "testimony from Mr. Landdeck in regards to [lockout/tagout] policies and his use of the fusion machine suggests that communication of the company's policies were neither accomplished nor effective from Mr. Landdeck's perspective."[53] Here, Landdeck told the inspector that he had not seen the lockout/tagout policy before and did not review the standard operating procedure for pipe cleaning. He gave equivocal "it's possible" answers to several questions about the safety policies. Rain for Rent's description of its policies in the

---

[52] CP at 58.
[53] CP at 58.

record does not establish it adequately communicated to Landdeck the need to turn off the hydraulic pump before placing his hand between the jaws of the machine. Landdeck's equivocal testimony, along with the compliance officer's report, show a confused understanding of the policies, training, standard operating procedure, and JSAs as applied to removal of shavings.[54]

Third, Rain for Rent contends its safety program is effective in practice because only one injury took place in the past five years, it had a "lower than average amount of workers compensation claims," and it made efforts to comply with safety standards before the Department's inspection.[55] But "in order for the employer to prove that the enforcement of its safety program is effective, it must prove that the employee's misconduct was not foreseeable."[56]

Here, the manual addressed removing plastic shavings. The Department's construction expert testified that, by mentioning shavings in its manual, the manufacturer would "expect this as part of normal operations."[57] Rain for Rent's regional safety manager testified that the impending deadline for the work to be completed was a contributing factor to the incident. Given this context, absent review

---

[54] Rain for Rent also emphasizes the inaccurate observation by the Board that Landdeck completed the JSAs after the incident, although it is clear they were completed before the incident. But this inaccuracy does not undercut the Board's concerns about ineffective communication regarding the lockout/tagout policy and removal of shavings.

[55] Br. of App. at 30-31.

[56] Legacy Roofing, 129 Wn. App. at 366-67.

[57] CP at 387.

of an operator's manual or equivalent training, it was foreseeable that Landdeck would reach into the machine to remove shavings.

We conclude Rain for Rent failed to prove this incident was the result of unpreventable employee misconduct, thus its affirmative defense fails.[58]

### III. More Specific Standard

Rain for Rent argues the citation must be vacated because a more specific standard applies. Rain for Rent contends WAC 296-155-110, accident prevention program regulation, is more appropriate in this setting because it covers "violative conditions" such as inadequate safety plans.[59]

Under WAC 296-155-110(2), each employer must "develop a formal accident-prevention program, tailored to the needs of the particular plant or operation and to the type of hazard involved." The regulation specifies that the program must be outlined in a written format and lists minimal program elements for all employers.[60]

As the Board recognized, WAC 296-155-110 is not more specific than the safe place standard in this setting because "an accident prevention program applies universally to worksites and generally applies no more specifically to the facts of this case than they would in most other worksite situations."[61] The Department's expert witness even acknowledged Rain for Rent has "what is actually a very good written

---

[58] We need not address whether Rain for Rent took adequate steps to discover and correct safety violations. See Br. of App. at 29.

[59] Br. of App. at 34.

[60] WAC 296-155-110(3)(4).

[61] CP at 57.

accident prevention program."[62] The safe place standard requires employers to provide places of employment that are free of recognized hazards,[63] a more specific standard as applied here.

We conclude WAC 296-155-110 was not a more specific applicable standard in this setting. Therefore, we affirm.

WE CONCUR:

_____

Cox, J.

_____

_____

[62] CP at 397.
[63] WAC 296-155-040.